STATE of Minnesota, Respondent,

v.

Matthew Martin SCANLON, Appellant.

No. A05–586.

Supreme Court of Minnesota.

Aug. 10, 2006.

John Stuart, State Public Defender, Theodora Gaitas, Assistant Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Donna J. Wolfson, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

On January 22, 2005, appellant Matthew Scanlon was convicted of the first-degree premeditated murder of bait shop owner Vermont "Ike" Isaacson. On direct appeal, Scanlon alleges that (1) his statements of December 23, 2003, and March 27, 2004, were erroneously admitted in violation of his Fifth Amendment right to counsel; (2) he was erroneously prohibited from admitting evidence of an alternative perpetrator; (3) the state's discovery violations cumulatively deprived him of a fair trial; and, (4) the evidence was insufficient to sustain his conviction. We affirm.

On September 22, 2003, Ann and Tim Oorlog came home a day early from a trip. They arrived home at about 10:30 p.m. and noticed that the lights in the bait shop next to their home were off, but the bait shop door was open and the neon "open" sign in the bait shop window was on. The next day, when the Oorlogs arose at around 5:00 a.m., they noticed that the bait shop door was still open and the neon sign was still on, which was very unusual. Alarmed, Tim Oorlog went to the bait shop. He discovered the body of the bait shop owner, Isaacson, on the floor of the shop.

Isaacson was killed by a shotgun blast to the chest. The alarm had not been turned on or triggered, and Isaacson's keys were in his hand, indicating that he had been about to leave for the night when he was shot. Isaacson was known, at least within his circle of friends, to carry thousands of dollars of cash at all times. He favored $100 bills in particular, but his records, compared with the cash found in his secu-

rity deposit box, indicated that on the day he was murdered he might have been carrying a substantial number of twenties (totaling approximately $2500). Isaacson's wallet was not found, but the money in the register, in his bank bag, and in the motor shop in back of the bait shop was untouched. No directly incriminating or exculpating physical evidence was found at the scene or elsewhere.

Upon investigation, police learned that Scanlon, an acquaintance of Isaacson's, was the last person seen with Isaacson. A friend of Scanlon reported that Scanlon had remarked that Isaacson would be "an easy guy to knock off" because he was a loner and carried a lot of money on him.

Police further learned that Scanlon had significant financial difficulties. Scanlon lived with an aunt, to whom he paid $250–$300 rent per month. Scanlon had not been working for some time, and his personal and business checking accounts had been overdrawn and closed by his bank for nonpayment. He also had borrowed money from various friends and relatives that he had not repaid, and owed more than $19,000 in child support payments. His truck badly needed repairs, but he told acquaintances that he could not afford to get it fixed. Finally, the aunt with whom Scanlon lived had given Scanlon $830 in cash so that he could write a check for her monthly mortgage payment. On September 15, 2003, Scanlon's aunt received a threat of foreclosure, as Scanlon's mortgage check had bounced. Scanlon's aunt was upset and worried about the mortgage payment and confronted Scanlon about it. He told her not to worry about it, that he would go to the bank and "get things straightened out."

Though Scanlon had at one time worked in the bait shop, he had not worked there for a long time, and it was unusual for him to be there frequently or for long periods of time.[1] But beginning on September 16, 2003, and continuing for the week before Isaacson's murder, Scanlon suddenly began coming to the shop nearly every day and staying all day.[2] Scanlon told police that he arrived at the bait shop at about 8:30 a.m. on September 22. Both Isaacson and Scanlon remained at the shop until at least 7:30 p.m. Witnesses also testified that the radiator fluid stains by the bait shop were from Scanlon's vehicle, which had a leaking water pump. These stains appeared to indicate that the car had been backed up and parked briefly by Isaacson's car, where it would be difficult to see.

A neighbor testified to seeing Scanlon's truck still in the bait shop parking lot, now with its hood up, at 8:30 p.m. At that time he also saw Isaacson and Scanlon walking from the front of the bait shop to the back of the bait shop. Another witness testified that at about 8:45 p.m., Scanlon's truck was by the shop with its hood up.[3] A friend of Isaacson, Kenneth Day, testified that Isaacson called him at approximately 9:00 p.m. to ask Day to open and run the bait shop the next day, as Isaacson had to attend a trade show. Day reported that during the call, Isaacson did not indicate that anyone else was in the shop, and that Isaacson seemed to be getting ready to leave for the night.

At approximately 11:00–11:30 p.m., another witness, Thomas Anderson, saw a

1. An employee of the motor shop in the back of the bait shop testified that, prior to September 16, 2003, Scanlon used to stop by the bait shop only about once a month and stayed for only two to three hours.

2. Scanlon was at the shop all day on September 16th, 18th, 19th, and 22nd.

3. A different witness reported not noticing Scanlon's truck at the bait shop at 8:30 p.m.

truck by the bait shop with an individual inside. Anderson identified Scanlon's truck as consistent with the vehicle he had seen, but there were inconsistencies with his original statements about the truck and his description of the individual in the truck did not match Scanlon. A pizza deliveryman reported that at 11:30 p.m. there were no vehicles near the bait shop.

The night of Isaacson's murder, Scanlon returned to his aunt's house at approximately 10:30 p.m. and gave her about $1000–$1250 in 100s, 20s, and possibly 50s. Scanlon left and drove to a SuperAmerica gas station, where at about 11:00 p.m. he filled up his gas tank and bought sundries, paying in cash.

The next day, Scanlon went to another aunt's house at about 7:30 in the morning. He left briefly to buy about $100 worth of tools, antifreeze, and a new water pump, for which he paid cash. He returned to his aunt's house and made an unsuccessful attempt to fix his truck's water pump. When he found he could not fix the truck, he went to a Sinclair station with his cousin's fiancé, Eugene Strange. Scanlon told the Sinclair owner that he could spend up to $1000 fixing the truck. Scanlon paid the resulting $802.27 repair bill in twenties. While waiting for the car to be fixed, Scanlon bought lunch for Strange. Scanlon also promised to give Strange $100 to gamble with, but later revised the offer to $20. The police arrested Scanlon at the Sinclair station at 4:35 p.m. When arrested, Scanlon had either $298 or $398 in his wallet.[4]

Following a search of Scanlon's residence, the police found a .12 gauge shotgun in a closet near Scanlon's room.[5] While it was not possible for the police to determine whether that shotgun was the one that had killed Isaacson, it was the correct gauge. Police also recovered some Federal Cartridge Company brand number five shot in Scanlon's room. A firearms expert testified at trial that the shot cup and wad from the crime scene were Federal brand. The expert also testified that the weight of the pellets retrieved from Isaacson's body was most consistent with five shot, though the diameter of the somewhat mangled pellets appeared to match that of six shot (the expert noted that given the condition of the pellets, the diameter was also consistent with four and five shot).[6] Evidence at trial indicated that five shot was comparatively rare and not very useful for hunting. But a defense investigator testified that five shot is readily available at local stores.

*Scanlon's statements.* Scanlon gave three interviews to the police, and his stories varied widely. Scanlon was first interviewed on September 23, 2003, after he was taken into custody and received a *Miranda* warning. He spoke with police for a time and then requested counsel. The district court allowed officers to testify regarding the information elicited from Scanlon before he requested counsel, but excluded any testimony from the interview after the request for counsel. Scanlon was released after approximately a month.[7]

4. Conflicting testimony was given regarding the amount of money found on Scanlon.

5. The shotgun belonged to Scanlon's cousin.

6. The diameter approximation was .11 inches, which is the average diameter for 6 shot. The average diameter of 5 shot is .12 inches. The weight of five shot should be 2.58 grains, while six shot would weigh 1.95 grains on average. The average weight of the pellets from the shooting was 2.4 grains, much closer to the weight of five shot.

7. At that time Scanlon was not under arrest for the murder, but for his failure to pay child support.

Prior to the request for counsel, Scanlon told police he knew that Isaacson carried large amounts of money, that he believed that Isaacson carried even more money than normal when he was about to attend a trade show, and that he knew that Isaacson was going to attend a trade show on September 23 (the day after the murder). But Scanlon said that he had won the money he was spending on September 22nd and 23rd at Mystic Lake on September 17th. Scanlon said that he had won $4000 playing nickel slots and $5 blackjack. He stated that he had been gambling with $550 he had stashed away in a sleeping bag, which he had accumulated by withdrawing or holding back $100 amounts when depositing his paychecks. Scanlon told the police that he still had $1200 left over stashed inside the sleeping bag, in addition to the $4000 he claimed to have won gambling.

No money was found in Scanlon's room or truck. Upon investigation the police discovered that Scanlon had not withdrawn or withheld any money when he deposited his checks from work. Additionally, Scanlon had not told anyone about winning $4000, including two family friends Scanlon had spoken with at Mystic Lake on the day he was gambling.[8] Mystic Lake, which documents winning amounts of $1200 or more, had no record of Scanlon's winnings. Scanlon claimed that the absence of documentation was because he withdrew the winnings in increments instead of all at once.

Scanlon was next interviewed when he voluntarily came to the police station on December 23, 2003, to retrieve his social security card and driver's license. At that interview Scanlon was not arrested, was told that he was not under arrest, was told that he was not obligated to speak with the

investigator, and in the words of the district court, "at the end of the interview Investigator Talbot and [Scanlon] discussed their back problems, had a laugh, and even exchanged pleasantries." The district court ruled that because of the two-month break in custody and the fact that Scanlon was not in custody at the time of the December 23 interview, Scanlon's September 23 invocation of the right to counsel did not bar the admission of his December 23 statements.

At the December 23 interview, Scanlon told police that he had gotten the money that he gave his aunt from a post office money order for $856 that had been returned to him. He stated that he had cashed the money order at his bank on the morning of September 22. But post office databases did not show any postal money orders for that amount issued between July and October 2003, and Scanlon's bank stated that no money order for the amount or a similar amount had been cashed on any date between September 18th and September 23rd. Additionally, Scanlon was at the bait shop at 8:30 a.m. on September 22nd and stayed there all day, and the bank lobby did not open until 9:00 a.m. Finally, the bank representative stated that the bank would not have cashed a postal money order for Scanlon in any event, as his accounts at the bank were all closed prior to the time period in question.

Scanlon was again interrogated on March 27, 2004, shortly after he was arrested for Isaacson's murder. Scanlon does not contest that he was read and waived his *Miranda* rights at this interview. This time, when asked where he got the money to pay his aunt, Scanlon said he got part of it from a money order and part from a sleeping bag where he stashed

---

**8.** The defense argued that Scanlon had not told anyone about the $4000 because he

would then have had to pay people back the money he owed them.

money. Again, he did not mention winning any money at Mystic Lake.

Scanlon also gave different versions of his route home from the bait shop. Construction workers found Isaacson's driver's license near the intersection of highways 494 and 62, on one of the routes Scanlon reported taking home. Upon searching the area where the license was found, police officers further discovered Isaacson's hunting license, DNR site tag, and other cards with Isaacson's name on them. Isaacson's wallet was not recovered.

*Stephen Jones's testimony.* At trial, the state called Stephen Jones, who was incarcerated with Scanlon, to testify against Scanlon. Jones testified that Scanlon had confessed the crime to Jones in detail, and recounted those details. There were inaccuracies and inconsistencies in the story Jones said that Scanlon had told him.[9] Jones admitted during cross-examination that he would be receiving consideration for his testimony in the Scanlon matter, as his sentencing judge would be told of Jones's cooperation. Scanlon also extensively impeached Jones regarding his credibility, his criminal history, his present charge, and his access to information about Scanlon's crime from other sources.

*Discovery violations.* The state committed at least three discovery violations during trial, for which the district court eventually sanctioned the state. In all, Scanlon has raised seven discovery issues in this appeal.

*Alternative perpetrator evidence.* Prior to trial, Scanlon notified the court that he intended to present evidence of an alterna-tive perpetrator, S.A., who lived across the street from the bait shop. Allegedly, a neighbor, Mark Eliseuson, had told a friend, one of Scanlon's aunts, and a defense investigator that S.A. had told Eliseuson that S.A. had killed Isaacson. But at the pretrial hearing on the alternative perpetrator issue, Eliseuson stated that S.A. had not confessed to the murder, but had only said "If I would have done it, I would have gotten away with it." The friend and the aunt testified that Eliseuson told them that S.A. had confessed to killing Isaacson. The tape of Eliseuson's statement to the defense investigator was unclear.[10] Eliseuson did testify that S.A. was a drug dealer and carried guns. In addition to impeachment testimony, Scanlon submitted to the court evidence that S.A. was convicted in connection with the kidnapping of his wife, and had been a suspect in a recent gun theft case.

The district court excluded the alternative perpetrator evidence, concluding that the only connection between S.A. and the crime was impeachment statements consisting of several levels of hearsay. The court concluded, "[w]here somebody told somebody told somebody that he heard somebody say something, and that's kind of where we're at. I don't think it rises to the level of evidence with an inherent tendency to connect [S.A.] to the actual murder of Ike Isaacson."

The jury found Scanlon guilty of first-degree premeditated murder. The district court sentenced Scanlon to life imprisonment, and Scanlon now appeals his conviction to this court.

---

9. For example, Jones stated that Scanlon was concerned about "rare .20 gauge shells" found in his truck. But .20 gauge shot was not used in the Isaacson murder.

10. Eliseuson's taped statement was: "[S.A.] was drunk at a party or something, and he kind of bragged, umm, I was already kind of drunk, umm. * * * But, ahh, he, I remember him saying something about, umm, I got away with it, or I, or I, I can't, I can't remember exactly, but he, I know it was something to do with [Isaacson] and, you know, shooting him."

## I.

Scanlon notes that he ended his in-custody interrogation on September 23 by demanding counsel. He argues that he did not re-initiate conversation after requesting counsel, and that therefore his statements given on December 23 and March 27 were inadmissible because those statements were obtained in violation of his right to counsel.

■ In *Edwards v. Arizona*, the U.S. Supreme Court held that "an accused, * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). There are three steps to determine whether the *Edwards* rule, and thus a defendant's Fifth Amendment right against self-incrimination, was violated: First, the court must determine whether the suspect invoked his right to counsel during a custodial interrogation; if so, then "courts may admit responses to further questioning only on finding that [the accused] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right invoked." *State v. Munson*, 594 N.W.2d 128, 138–39 (Minn.1999) (internal quotation marks omitted).

■ The *Edwards* rule is intended to prevent police from badgering an in-custody suspect. *Arizona v. Roberson*, 486 U.S. 675, 685–86, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Because of this principle, the *Edwards* rule applies to any interrogation after a request for counsel, whether about the initial crime or a different crime. *Roberson*, 486 U.S. at 683–84, 108 S.Ct. 2093. "[T]o a suspect who has indicated his inability to cope with the pressures of *custodial interrogation* by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling." *Id.* at 686, 108 S.Ct. 2093 (emphasis added).

■ *Edwards* does not address whether this rule survives a break in custody. Nor have we previously addressed the question. But in *McNeil v. Wisconsin*, the Supreme Court intimated that *Edwards* would not apply where a break in custody occurred: "If the police do subsequently initiate an encounter in the absence of counsel (*assuming there has been no break in custody*), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial * * *." 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis added). Additionally, many state and federal courts have held that a break in custody defeats the *Edwards* rule.[11] Indeed,

11. *See, e.g., United States v. Harris*, 221 F.3d 1048, 1052–53 (8th Cir.2000) (three-hour break in custody defeated *Edwards* protection, as defendant "had ample opportunity to consult his family, friends, or a lawyer"); *United States v. Barlow*, 41 F.3d 935, 945 (5th Cir. 1994) (following other circuits in holding that if, "after invoking her Fifth Amendment right to counsel, a suspect is released from custody, then the concerns that prompted *Edwards'* prophylactic rule are sufficiently minimized that any *Edwards* violation allegedly founded on those prior requests simply 'dissolves.' ");

*McFadden v. Garraghty*, 820 F.2d 654, 661 (4th Cir.1987) (two breaks in custody severed any causal link between the initial unlawful interrogation and appellant's voluntary confessions); *United States v. Skinner*, 667 F.2d 1306, 1309 (9th Cir.1982) (holding that *Edwards* protection does not apply where the suspect was not in continuous custody); *State v. Norris*, 244 Kan. 326, 768 P.2d 296, 302 (1989) (defendant's Fifth Amendment right to counsel terminates when he is released from custody); *State v. Alley*, 841 A.2d 803, 809 (Me.2004) (after a break in custody—here, six

one court observed that "Although this is an issue of first impression in this circuit, we note that other courts have unanimously reached this conclusion." *Kyger v. Carlton,* 146 F.3d 374, 380–81 (6th Cir. 1998) (holding that *Edwards* does not apply to suspects who are not in continuous custody).

Some courts have added a caveat that the release from custody must not be made in bad faith (i.e., done merely as an attempt to defeat *Edwards* ). *See, e.g., State v. Bymes,* 258 Ga. 813, 375 S.E.2d 41, 42 (1989) (*Edwards* protection defeated where there was "no indication appellee's release from custody was a mere ploy in order to seek another waiver"). Other courts have adopted a "totality of the circumstances" test to determine whether the break in custody was sufficient to defeat the *Edwards* protection. *See, e.g., United States v. Bautista,* 145 F.3d 1140, 1150 (10th Cir.1998) ("Whether a break in custody is sufficient to remove a suspect's request for counsel from the ambit of Edwards must be evaluated under the totality of the circumstances.").

■ We conclude that a break in custody limits the applicability of *Edwards.* Here, there were months between Scanlon's invocation of his right to counsel and his subsequent statements—months in which he was not in custody. By any standard, Scanlon was therefore sufficiently "out of custody" for his *Edwards* invocation to be nullified. Because Scanlon conceded at oral argument that there is no evidence that Scanlon's release was pretextual, we need not consider whether the break in custody rule is subject to an exception for pretextual release or other limitation.

At oral argument, Scanlon argued in the alternative that the Minnesota Constitution mandates the suppression of the two statements at issue here. Scanlon cites *State v. Risk,* where we held that the Minnesota Constitution required police officers, when faced with an ambiguous *Edwards* request for counsel, to "stop and clarify" whether the defendant was in fact requesting counsel. *State v. Risk,* 598 N.W.2d at 642, 648–49 (Minn.1999). In *Risk,* while we acknowledged that the Supreme Court in *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), had held that a request for counsel must be "clear and unambiguous" to qualify as an invocation of *Edwards* protection under the Federal Constitution, we concluded that the "stop and clarify" approach was required to satisfy the protection against self-incrimination provided by Article 1, Section 7 of the Minnesota Constitution. *Risk,* 598 N.W.2d at 647–49.

While it is true that in *Risk* we interpreted the protection against self-incrimination afforded by the Minnesota Constitution as reaching further than that of the Federal Constitution, in *Risk* we simply re-affirmed a longstanding rule. We had articulated the "stop and clarify" rule several years prior to the Davis decision. *State v. Robinson,* 427 N.W.2d 217, 223 (Minn.1988). Here, there is no preexisting precedent regarding the effect of a break in custody, and we decline to create one.

II.

Scanlon argues that the district court inappropriately excluded Scanlon's alternative perpetrator evidence based on the court's assessment of Eliseuson's credibility. Scanlon adds that the reverse-*Spreigl* evidence against S.A. was also admissible because the incidents show that S.A. had

hours in length—law enforcement officials may reinitiate interrogation in the absence of

counsel as long as the defendant has had a reasonable opportunity to contact counsel).

access to a .12 gauge shotgun and would steal from a vulnerable person. Scanlon contends that the error was not harmless as it could have affected the verdict.

■ "Rulings on evidentiary matters rest within the sound discretion of the district court, and we will not reverse a district court's evidentiary ruling absent a clear abuse of discretion." *State v. Moua*, 678 N.W.2d 29, 37 (Minn.2004).

We have held that evidence of an alternative perpetrator can only be admitted if the evidence has an "inherent tendency" to connect the alternative perpetrator with the crime. *State v. Jones*, 678 N.W.2d 1, 16 (Minn.2004). Additionally, we have noted that a defendant's right to present witnesses is constitutionally protected, but "with that right comes the obligation to comply with procedural and evidentiary rules." *State v. Blom*, 682 N.W.2d 578, 621 (Minn.2004). In *State v. Palubicki*, 700 N.W.2d 476, 485–86 (Minn.2005), we explained that "evidence having an inherent tendency to connect the alternative perpetrator to the crime" meant evidence which somehow connects the alternative perpetrator to the crime scene. Recently, in *State v. Vance*, we concluded that the district court did not err in excluding evidence suggesting J.M. as an alternative perpetrator where the only evidence having an inherent tendency to connect J.M. to the crime was inadmissible hearsay. *State v. Vance*, 714 N.W.2d 428, 437–38 (Minn.2006).

■ In this case, the defense sought to admit as alternative perpetrator evidence Eliseuson's testimony that he did *not* hear S.A. confess to Isaacson's murder, and then the impeachment testimony of Scanlon's aunt and his aunt's friend that Eliseuson told them that he *did* hear S.A. confess. A witness may be impeached using a prior inconsistent statement, and extrinsic evidence of a prior inconsistent statement by a witness is admissible if the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness thereon, or as otherwise required by the interests of justice. Minn. R. Evid. 613. But the impeachment statements of Scanlon's aunt and her friend are double hearsay and are therefore presumptively inadmissible. *See* Minn. R. Evid. 801(c).[12] Scanlon does not present arguments here as to why these hearsay statements should be admitted as substantive evidence.[13] Under *Vance* and under

---

12. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). Minnesota Rule of Evidence 801(d) states that a statement is not hearsay if: (1) "The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, [and (2)] the statement is * * * inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." But Eliseuson's statements were not made under these qualifying circumstances.

13. Scanlon argued prior to trial that the statements should be admitted under Minn. R. Evid. 803(24), the "catch-all" hearsay exception, which allows introduction of a hearsay statement

> not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

It is very unlikely that Eliseuson's hearsay would be considered particularly trustworthy, as he himself admitted that he and S.A. were both quite drunk at the time of the "confession." *See supra* note 10.

the circumstances of this case, inadmissible hearsay statements cannot inherently connect an alternative perpetrator to a crime, and the district court did not err in excluding the disputed evidence.

 Scanlon also sought to introduce testimony from Eliseuson that S.A. stole guns from a third party and additional evidence that S.A. might have had a .12 gauge shotgun. But evidence of other crimes, wrongs, or bad acts committed by the alleged alternative perpetrator ("reverse-*Spreigl*" evidence) is admissible only if the defendant has met the threshold requirement of sufficiently connecting the alternative perpetrator to the commission of the crime with which the defendant is charged. *Jones*, 678 N.W.2d at 16. Here, there was no evidence produced that inherently connected S.A. to Isaacson's murder, and absent such evidence the district court did not err in excluding the reverse-*Spreigl* evidence.

### III.

Scanlon argues that the state committed numerous discovery violations and that the state's misconduct and carelessness resulted in prejudice to the defense and deprived Scanlon of a fair trial. Scanlon further argues that even if there was no prejudice here, this court should still grant a new trial because repeated discovery violations should not be tolerated. The state counters that it only committed three actual discovery violations, none of which were in bad faith or were prejudicial.

 Whether a discovery violation occurred is an issue of law, which we review de novo. *State v. Bailey*, 677 N.W.2d 380, 397 (Minn.2004). We review a trial court's decision on whether to impose sanctions for discovery violations for an abuse of discretion. *State v. Patterson*, 587 N.W.2d 45, 50 (Minn.1998). "Generally, without a showing of prejudice to the de-

fendant, the state's violation of a discovery rule will not result in a new trial." *Palubicki*, 700 N.W.2d at 489. The determination of whether a new trial should be granted "due to prosecutorial misconduct" " 'is governed by no fixed rules but rests within the discretion of the trial judge, who is in the best position to appraise its effect.' " *Id.* (quoting *State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn.1980)).

In determining sanctions or remedies for discovery violations, this court has set forth the following factors to be considered: (1) the reason why the disclosure was not made; (2) the extent of the prejudice to the opposing party; (3) the feasibility of rectifying that prejudice with a continuance; and (4) any other relevant factors.

*Woodruff v. State*, 608 N.W.2d 881, 886 (Minn.2000). "A trial court's determination should be reversed on appeal only when the prosecutor's misconduct, 'viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that [the] defendant's right to a fair trial was denied.' " *Palubicki*, 700 N.W.2d at 489 (alterations in the original) (quoting *Wahlberg*, 296 N.W.2d at 420). Any discovery-related misconduct on the part of the state is "harmless beyond a reasonable doubt if the verdict rendered was surely unattributable to the error." *Id.*

 The district court concluded that the state committed three discovery violations. The first and most serious violation occurred when Detective Kirby mentioned at trial that he had shown the shot cup, wadding, and some pellets from the crime scene to a Minneapolis Police Department firearms examiner, Dana Klauss, and that Klauss had made a preliminary determination that the pellets were five shot. Scanlon had not received any notice of this preliminary evaluation or opinion, and it

undermined his argument that the pellets were actually six shot. Apparently, Scanlon had received no notice because the state did not realize that Kirby had not noted the preliminary evaluation in his reports. Scanlon made a motion for mistrial, but later withdrew the motion. The court ruled that this was a discovery violation and issued a curative instruction, but stated that the prejudice was not so extreme as to warrant a mistrial.

The state's failure to disclose Klauss's examination was a violation of Minn. R.Crim. P. 9.01, subd. 1(4). But the district court's conclusion that the violation was not sufficiently prejudicial to cause a mistrial was not an abuse of discretion; the mention was brief, and took place before the expert testimony on the nature of the shot. The jury was not yet aware of the significance, if any, of the size of the shot. And realistically, it is unlikely that the jury concluded much from the alleged comparative rarity of five shot, because there was defense testimony indicating that five shot can be inexpensively and easily purchased. The significant evidence against Scanlon was that he was with the victim just before the murder, that he had no money before the murder, and that after the murder he had thousands of dollars in cash.

■ The two additional violations were even less prejudicial. First, in the course of Jones's testimony, Scanlon discovered that Jones had had a brief preliminary interview with a detective, which was not reduced to a report or disclosed to the defense. The district court ruled that the substance and existence of the meeting with the detective should have been disclosed, but that there was no prejudice to

Scanlon from the discovery violation. Second, at one point during cross-examination, Officer Talbot stated that Jones had said that Scanlon told him that Scanlon's father had helped get rid of the murder evidence. Talbot further said that he had asked Scanlon's father about this and the father had denied it; this interview with the father had not been previously disclosed to Scanlon. The district court ruled that this was another discovery violation on the part of the prosecution and ordered the prosecutors to show cause, at the end of trial, as to why they should not be held in contempt for their discovery violations. But the court also refused to dismiss the case because it ruled that there was no prejudice to the defense from the violation. We agree with the court that these were violations of Minn. R.Crim. P. 9.01, subd. 1(2), but we further agree with the court that no prejudice resulted from the violations.

■ Scanlon raises four other alleged discovery violations. These alleged violations were not ruled on by the district court and were without any prejudicial effect. First, prosecutor Richardson admitted to meeting with Jones the day before Jones testified, but did not inform Scanlon of the substance of this meeting as required by rule 9.01, subd. 1(2). Second, the medical examiner initially refused to release her files to the defense despite receiving a subpoena requiring the release. Then, when Scanlon finally received the file, Scanlon discovered a note inside the medical examiner's file stating that a sheriff's deputy had mentioned that there had been a series of "smash and grabs" [14] along Highway 7 around the night of Isaacson's murder. Third, during the testimony of fingerprint analyst Deputy Nelson, Scan-

14. The deputy described "smash and grabs" as "[w]here somebody smashes the front window or door to a business to gain entry and just retrieves items from the business and leaves right away, they don't spend a timeframe in there searching the business, taking other items."

lon realized that Nelson was referring to notes that had not been provided to Scanlon. As to the latter allegation, Scanlon volunteered that there was no prejudice to the defense, presumably because there were no useable fingerprints found at the crime scene or elsewhere. Fourth, Scanlon claims that the state had reached a deal with Jones on the number of months the state would request that Jones serve as a result of his conviction in the unrelated matter, but had denied to Scanlon that any such agreement was reached. We need not examine these alleged errors in depth, as even were we to find them all to be error, none were prejudicial. We note, however, that the state did not appear to have control over some of the files requested, and that the state correctly told Scanlon that there was no deal as to the length of Jones's sentence.

Scanlon argued, and we acknowledge, that there is a line of cases that emphasize our power to overturn a verdict based on discovery violations even if prejudice is not explicitly shown. *State v. Kaiser*, 486 N.W.2d 384, 387 (Minn.1992) (citing *State v. Schwantes*, 314 N.W.2d 243, 245 (Minn. 1982) ("[A]lthough the evidence of defendant's guilt was strong, we conclude that a new trial is required in the interests of justice and to insure that the reciprocal discovery rules adopted by this court are observed by both the prosecution and the defense.")). But in these cases, the evidence was concealed in bad faith or was very important to the defense. *See Kaiser*, 486 N.W.2d at 386–87 (prosecutor deliberately concealed exculpatory information, telling witness to "keep her mouth shut"); *Schwantes*, 314 N.W.2d at 245 (defendant allowed wife to testify because he did not know of her previous interview statements).

The violations here appear to be the result of oversight or mistake, not deliberate attempts to hide facts or surprise the defense. The state was not scrupulous, and was properly sanctioned, but none of the violations were prejudicial, even cumulatively, and Scanlon was not deprived of a fair trial.[15] There is no evidence of bad faith here, and the information would not have prompted a change in trial strategy, nor was it exculpatory. This case does not qualify for reversal under the *Kaiser* line of cases.

## IV.

Scanlon argues that the evidence against him is insufficient to sustain his conviction. Scanlon points out that but for the questionable testimony of Jones, the evidence against Scanlon is entirely circumstantial, that there are gaps in the evidence, and that "[a]lthough [the evidence against Scanlon] is certainly consistent with a hypothesis of guilt, it is also equally consistent with alternative hypotheses."

When analyzing a claim of insufficient evidence, we undertake a "painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in the light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Pendleton*, 706 N.W.2d 500, 511 (Minn.2005).

In *State v. Webb*, we held that a case made up of circumstantial evidence was insufficient to support a guilty verdict, despite the court's statement that circumstantial evidence "is entitled to as much weight as other kinds of evidence." 440 N.W.2d 426, 430–31 (Minn.1989). We stated that a conviction based on circumstan-

---

**15.** The penalty imposed on the prosecutors for having mishandled the discovery process was that they had to teach a course on discovery.

tial evidence will only be upheld if, when viewing the evidence in a light most favorable to the conviction, " 'reasonable inferences from [the circumstantial] evidence are consistent only with the defendant's guilt and inconsistent with any rational hypothesis except that of his guilt.' " *Id.* at 430 (quoting *State v. Anderson,* 379 N.W.2d 70, 75 (Minn.1985)). We acknowledged that the jury normally is in the best position to evaluate circumstantial evidence, and that a jury verdict is entitled to due deference, but still concluded that the evidence was insufficient to convict the appellant:

> The circumstances in this case which are consistent with the hypotheses of guilt are the facts that the body of the victim was found in the vicinity of the appellant's apartment; he was seen speaking to her earlier in the day; and his bedspread was found near the victim. Additionally, an unidentified man was seen dragging a heavy object along the sidewalk near the appellant's apartment. After the murder, appellant shaved his beard and gave away some of his clothing, and later made an apparently joking reference to a friend that he "did it."
>
> These circumstances may cast a suspicion of guilt on the appellant, but they in no way exclude other rational inferences which can also be drawn from these circumstances. Other circumstances in this case undercut the state's hypothesis of the appellant's guilt, and support the hypothesis that appellant did not commit the crime. * * * No physical evidence was discovered linking the victim with the appellant or his apartment despite a painstaking investigation for such evidence. * * * No blood, body fluids, hair or fibers were found in the apartment to indicate that the victim had ever been there, much less was murdered there and was then redressed by appellant.

*Webb,* 440 N.W.2d at 430–31 (footnote omitted). The court also specifically noted that the state had failed to establish any credible motive for the crime. *Id.* at 431.

Similarly, in *State v. Jones,* we concluded that the fact that Jones owned the gun his brother used to shoot the victim, that Jones was provoked by the victim the day before the shooting, and that Jones might have owned the bicycle his brother was using, were insufficient facts from which to conclude that Jones conspired with his brother. 516 N.W.2d 545, 547–49 (Minn. 1994). "Other rational conclusions, such as the conclusion that [Jones's brother] determined on his own to avenge the wrongs to [Jones], are consistent with the evidence presented." *Id.* at 549.

In this case, there is no direct evidence connecting Scanlon to the crime, unless the testimony of Jones is credited. It is *possible* that someone else happened to come by just as Scanlon left, and shot Isaacson, and that Scanlon coincidentally managed to secure thousands of dollars that day. It is possible that Scanlon got the money through another illegal source and lied about the source of the money to the police for that reason, or that he did win it at Mystic Lake, simply decided not to tell anyone or spend any of it until September 23, and later made up a story about postal orders for unknown reasons. But all of these scenarios stretch the concept of "rational hypothesis" to absurd limits. We see no reason here to disturb the verdict of the jury.

Affirmed.