**STATE of Minnesota, Respondent,**

v.

**Franklin Alan MILLER, Appellant,**

**Franklin Alan Miller, Petitioner–Appellant,**

v.

**State of Minnesota, Respondent.**

**Nos. A05–2519, A07–2195.**

Supreme Court of Minnesota.

Aug. 21, 2008.

Lawrence Hammerling, Chief Appellate Public Defender, Michael F. Cromett, Assistant State Public Defender, Office of the State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Minnesota Attorney General, Kelly O'Neill Moller, Assistant Attorney General, Office of the Attorney General, St. Paul, MN, and Melanie S. Ford, St. Louis County Attorney, Duluth, MN, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

A Saint Louis County jury found Franklin Alan Miller guilty of two counts of first-degree murder and two counts of kidnapping for the July 2004 kidnapping and death of Travis Holappa. The district court convicted Miller for first-degree murder committed in the course of kidnapping, Minn.Stat. § 609.185(a)(3) (2006), and sentenced him to life in prison. Miller filed a direct appeal, which was stayed pending the filing of a petition for postconviction relief. After holding an evidentiary hearing, the postconviction court denied relief and Miller has appealed that decision. We now consider both Miller's direct

and postconviction appeals. Miller argues that (1) the grand jury indictment should have been dismissed because the State withheld exculpatory evidence from the grand jury; (2) the court committed reversible error when it excluded reverse-*Spreigl* evidence; (3) the court committed reversible error in admitting the victim's hearsay statements; (4) the State's discovery violations warrant a new trial; (5) the State committed misconduct by not correcting false testimony; and (6) he received ineffective assistance of trial counsel. We affirm.

In the early morning hours of June 15, 2004, Travis Holappa stole appellant-petitioner Franklin Alan Miller's pickup truck while both men were attending a party at Jesse Ridlon's home in Aurora. When the truck was stolen, it contained a camcorder belonging to Ridlon, Miller's backpack containing methamphetamines and several thousand dollars, and an all-terrain vehicle (ATV) in the pickup bed. Holappa was not heard from until later that morning when he called a friend to ask for a ride home. Holappa's friend picked him up in Cotton, where Holappa was waiting for him at a gas station without Miller's truck or ATV. On June 19, the police found Miller's truck in a rural area between the cities of Aurora and Cotton. When the police recovered the vehicle, Ridlon's video camera was in the truck but Miller's ATV was not. No methamphetamines or money were found in the truck.

A few days later, Holappa returned to the Cotton area with a friend to look for Miller's ATV, which had not yet been recovered. Holappa located Miller's ATV in a wooded area and rode it to Ridlon's house to return it to Miller. Holappa's friend followed him by car. After returning the ATV to Miller, Holappa got into his friend's car and said, "[a]t least I know [Miller] can't hit very hard." Holappa's friend did not witness the exchange between Holappa and Miller.

Sometime in mid-July, Miller talked to Jason Anderson about recovering the money Holappa had taken in June. Anderson had collected drug debts for others in the past using violence or threats. Anderson agreed to help collect the money in exchange for forgiveness of Anderson's own drug debt to Miller.

*Miller and Anderson Kidnap Holappa*

On July 24, Anderson, Miller, and Ridlon were at Ridlon's house smoking methamphetamines along with Jeremy Finke, Miller's brother Sam Miller, and a few other people. That evening Anderson and Finke drove to Virginia to pick up an ATV for Ridlon that Ridlon had planned to purchase through an acquaintance. When the two men arrived in Virginia, they were informed that the arrangement to get the ATV had fallen through and were told to return the next day. Before returning to Ridlon's house on the evening of July 24, Anderson and Finke stopped by a party in Virginia where Anderson saw Holappa smoking methamphetamines. At that time, Anderson threatened Holappa to "pay up."

When Anderson and Finke returned to Ridlon's house that evening, Anderson told Miller that he had seen Holappa in Virginia. Miller was angry to learn that Holappa was partying and smoking methamphetamines when he still owed Miller money. At Miller's suggestion, Anderson called Holappa, and they agreed to meet at the Gladiator bar in Gilbert that night. Miller and Anderson drove to the bar in Miller's Cadillac. When Miller and Anderson arrived at the bar, Holappa had not yet arrived. Anderson testified that Miller became quite angry upon learning that Holappa was not there.

Holappa arrived at the Gladiator bar shortly after Miller and Anderson. He

had walked to the bar from his friend Adam Hill's house in Gilbert. Holappa told Hill he was going to meet Anderson to discuss the money he owed Miller. Hill followed Holappa in his car and parked near the bar in a location where he could continue to observe Holappa. When Holappa saw Miller and Anderson in Miller's Cadillac, he walked over to the car. Hill testified that he saw Anderson get out and shake Holappa's hand just before Anderson "started throwing blows at [Holappa]." When Hill started toward Miller's car to help Holappa, Miller jumped out of the driver's seat and threatened Hill, saying "F* * * it. I'll shoot you right now." Hill did not see a gun but fled the scene.

Anderson testified that when he and Miller confronted Holappa at the Gladiator bar, Miller was armed with a .22–caliber pistol. Anderson stated that Miller displayed the gun when he ordered Holappa into the back seat of the Cadillac. Miller drove the car and while driving he demanded money from Holappa and hit him. Miller drove to a friend's house in Aurora where he picked up a white Mitsubishi that he was considering purchasing. From there, they went to a friend's house in Biwabik; Miller drove the Mitsubishi and Anderson drove the Cadillac. During this trip Holappa remained in the back seat of the Cadillac.

Upon arriving at the friend's house in Biwabik, Anderson went into the house while Miller remained outside arguing with Holappa, who remained in the back seat of the Cadillac. Some time later when Miller went into the house, he told Anderson that Holappa was in the trunk, but did not specify whether he meant the trunk of the Mitsubishi or the Cadillac. Anderson and Miller stayed at the Biwabik house smoking methamphetamines with a few other people until morning. At some point dur-

ing the night Sam Miller stopped by the Biwabik house with Danielle Frazee. Anderson heard Miller tell Sam Miller that "he had Travis."

On the morning of July 25, Anderson and Miller left Biwabik and drove both cars to Ridlon's house in Aurora. After they arrived, Miller pulled Holappa, who was still alive, out of the trunk of the Mitsubishi and put him on the floor in Ridlon's garage. Holappa was not tied up, but he still had some duct tape on him from being bound. Miller, Ridlon, and Anderson each demanded money from Holappa. Miller, who Ridlon described as "wound up real tight," started "smacking [Holappa] around, pistol-whipping him." According to Anderson and Ridlon, Miller also hit Holappa with a fan belt. Ridlon admitted to kicking Holappa. Anderson claimed he did not strike Holappa, but Ridlon testified that Anderson "slapped him up a little bit." After assaulting Holappa, Miller bound him with duct tape and put him back into the trunk of the Mitsubishi. Miller, Anderson, and Ridlon all smoked methamphetamines, and Miller and Ridlon worked on Miller's ATV.

That afternoon, Anderson and Finke again drove to Virginia in Finke's truck to attempt to pick up the ATV that Ridlon was planning to purchase. Anderson testified that when he left Ridlon's house, Holappa was alive and in the trunk of the Mitsubishi. Anderson and Finke picked up the ATV for Ridlon, and then Finke dropped Anderson off at Anderson's mother's house in Eveleth. Anderson did not return to Ridlon's house on July 25.

While Anderson and Finke were in Virginia, Ridlon and Miller continued to work on their ATVs. Sam Miller and another friend came over to Ridlon's house. Sam Miller smoked methamphetamines and worked on a dirt bike. At this time, the Mitsubishi was parked by a shed on Rid-

lon's property, and Ridlon testified that from time to time he "could hear [Holappa] banging on the car" from the inside of the trunk. Ridlon and another witness both testified that Miller went out to the Mitsubishi that afternoon. Sam Miller also saw Miller talking to Holappa by the Mitsubishi. During this conversation, Holappa was lying on the ground. When Sam Miller asked Miller about what was going on, Miller told him to "[j]ust mind [his] own business." While at Ridlon's house that afternoon, Sam Miller also heard Miller say that he wasn't "going to have nobody do [his] dirt."

Later that day, Sam Miller, Miller, and a friend made plans to go dirt biking at a friend's house. Miller changed into his dirt biking clothes while Sam Miller and his friend loaded their bikes onto a truck. Sam Miller testified that at this point Miller appeared stressed and angry. Miller told Sam Miller that he would meet the rest of them at the friend's house where they were planning to do their bike riding because he had "some shit to take care of." Sam Miller and his friend drove to the friend's house without Miller.

A couple of hours later, Miller arrived at the friend's house and told Sam Miller that he had "had something to take care of." Sam Miller asked Miller what Miller had done with Holappa, to which Miller said he "emptied a clip in him." At trial, Sam Miller testified that Miller said that he was "just kidding" and that he had "sent [Holappa] to Colorado." At trial, Sam Miller described Miller's mood as "joking." After this exchange, the group went dirt biking.

When it started to get dark outside, Miller rode his dirt bike back to Ridlon's house. Finke had already returned from Virginia when Miller arrived just before dark. Shortly after Miller arrived, Ridlon left to work his usual night shift at Inland

Steel. Finke testified that Miller looked "wrecked" and like "he needed sleep." That evening Miller fell asleep on a couch in Ridlon's garage.

Around midnight on the night of July 25, the owner of the Mitsubishi came by Ridlon's house to pick up his house keys, which were inside the Mitsubishi. Miller was still asleep at this time. The owner took his keys, but left the Mitsubishi on Ridlon's property. Later that night, Finke had trouble waking Miller for a telephone call. Finke testified that when Miller awoke, he was "out of it," did not seem to know where he was, and "wasn't making sense." Miller began pacing back and forth in the garage, swearing at Finke and acting "pissed off mad." Finke noticed that Miller had a pistol in his hand. Finke stated that he was "scared as hell" by Miller's behavior, so he went into Ridlon's house and locked the door. While inside he saw Miller leave in his Cadillac.

Some time before midnight, Frazee and a friend picked Anderson up at his mother's house in Eveleth and went to a friend's apartment in Virginia to smoke methamphetamines. In the early morning hours of July 26, Miller came to the apartment, and Anderson asked Miller what happened to Holappa. Miller told Anderson to keep his mouth shut, saying "[t]hey ain't got enough to indict me."

The Mitsubishi was still on Ridlon's property on July 26. Ridlon testified that at this point he "freaked out" because he did not know if Holappa was still in the trunk. As a result, he towed the car off of his property.

*Destruction of the Gun*

On the night of July 26, Richard McNeill brought Miller to Dean Dunn's house in Iron. Dunn and McNeill had been friends for about a year and one-half, but Dunn had only met Miller once before. The men

went into Dunn's garage, which served as Dunn's workshop. McNeill took out a .22–caliber automatic pistol and started sliding the chamber open and closed and pushing the pistol clip in and out. McNeill then put the gun down and told Dunn to "cut it up." Dunn testified that he told McNeill that he did not want to participate. At that point, Miller picked up the gun, pointed it at Dunn, and told him to do as he is told. Dunn told McNeill to take the wood grips off the gun, and then Dunn melted the gun over a galvanized metal 30–gallon garbage container. Dunn burned the wooden grips in the fire pit behind his house. A few days later, Dunn threw the molten metal from the gun into a ditch.

After destroying the gun, McNeill called Frazee, who came over to Dunn's house where they all proceeded to smoke methamphetamines. Miller then left in his Cadillac with Frazee following him in her vehicle. Miller abandoned the Cadillac on the side of the road near Zim, and Frazee then drove Miller to the Twin Cities.

*Police Investigate Holappa's Disappearance*

The day after Holappa was kidnapped, one of his sisters filed a missing person report. On July 27, Anderson was arrested by police for the kidnapping. The police were unable to locate Miller at that time. Hill, who had witnessed Holappa leave the Gladiator bar with Miller and Anderson, testified at trial that a few days after Holappa was kidnapped, Hill spoke to Miller on the telephone. When Hill asked where Holappa was, Miller said that he "sent him on a one-way ticket somewhere" and that he "wasn't going to come back."

On July 29, Ridlon led the police to the Mitsubishi, which was identified by its owner as the car Miller took on July 24. Inside the trunk, the police found matted duct tape, a belt, a broken watch, and suspected blood and urine. The watch was later identified as Holappa's. DNA tests performed on the blood in the trunk resulted in a match to Holappa.

On July 31, the police recovered Miller's Cadillac after receiving a tip from a citizen. The vehicle had been abandoned, within a few miles of Dunn's residence. A .22–caliber cartridge casing was found on the floor inside the Cadillac. Miller's fingerprints and dirt biking clothes were found in the Cadillac as well.

On August 2, the police located and arrested Miller and took him to the county jail. While in jail, he spoke on the telephone with his girlfriend, K.K. During an August 6 call, K.K. told Miller that there was a news report that a friend of Miller's had told the police where Holappa's body could be found. A few minutes later during that conversation, Miller told K.K. he was feeling sick to his stomach. In a conversation about ten minutes later, K.K. told Miller that she was sorry because "this is all my fault," to which Miller said "You had nothing to do with it. I did it. I'm f* * *ing, you know,—I pay—you know, I played, I pay. That's how it goes."

*Holappa's Body Found*

On September 2, 2004, some partial human skeletal remains were found by a hunter near the Whiteface River. The remains were later identified as being Holappa's based on his dental records. Cartridge casings, three bullet fragments, and pieces of duct tape were also found at the scene.

A medical examiner was asked to examine Holappa's remains. The examiner testified at trial that based on the number of gunshot wounds on the remains, Holappa was hit by 11 bullets. There were 10 gunshot wounds to the head and 1 gunshot wound to the scapula. The wounds were

clustered in two groups at the back and on the left side of the skull. The angle of the wounds in the back of the skull and the scapula indicated that the shooter was standing behind and above Holappa and that Holappa was hunched over when shot. The pattern of the fractures to the skull resulting from the shots indicated that the shots to the back of the head and the scapula occurred before the shots to the side of the head. The angle of the shots and their tight pattern on the left side of the skull indicated that Holappa was not likely moving when those shots were fired. The examiner stated that the injuries were consistent with Holappa being bent over on his knees at the time he was shot in the scapula and back of the head and with him lying on his right side with the weapon being held directly perpendicular to his body when the shots to the left side of the skull were fired. The examiner concluded that the cause of death was gunshot wounds to the head, and classified Holappa's death as a homicide.

Six .22–caliber cartridge casings were recovered at the scene where Holappa's skeletal remains were found. An expert firearm examiner testified that these cartridge casings and the cartridge casing recovered from Miller's Cadillac were all fired from the same weapon. The expert also testified that the fact that the casings were all found within a 5 to 6 foot diameter area suggested that they were fired from a semiautomatic pistol. The expert further testified that the magazine of a .22–caliber pistol frequently has a 10–bullet capacity. Such a pistol could be fired 11 times without reloading if one bullet was chambered and there were 10 bullets in the magazine.

*Indictment and Trial*

Following the discovery of Holappa's remains and the police investigation into the circumstances of his death, a grand jury indicted Miller for two counts of first-de-

gree murder and two counts of kidnapping. Anderson, Ridlon, Sam Miller, Hill, Dunn, and Frazee all testified before the grand jury, in addition to a BCA investigator and the medical examiner. These witnesses, along with 33 others, also testified for the State at Miller's jury trial. At trial, statements by Holappa were admitted over Miller's objection. In his defense, Miller offered testimony of three individuals regarding reverse-*Spreigl* evidence of Anderson's prior bad acts. The district court admitted one witness's reverse-*Spreigl* testimony, but excluded the testimony of the other two individuals.

The jury found Miller guilty on two counts of first-degree murder and two counts of kidnapping. The district court then convicted Miller of first-degree murder committed in the course of kidnapping, in violation of Minn.Stat. § 609.185(a)(3), and sentenced him to life in prison. Miller filed a direct appeal, and we granted a stay for the purposes of filing a petition for postconviction relief. In his postconviction petition, Miller alleged that the State failed to disclose exculpatory evidence and that he received ineffective assistance of trial counsel. After an evidentiary hearing, the postconviction court denied Miller's petition for postconviction relief, and this consolidated appeal followed.

### I.

■■■ Miller's first claim is that the district court erred in denying his pre-trial motion to dismiss the grand jury indictment. "A grand jury proceeding is not a trial on the merits and grand jurors do not determine guilt or innocence ..." *State v. Lynch,* 590 N.W.2d 75, 79 (Minn.1999). Instead, the grand jury's function is to "determine whether there is probable cause to believe the accused has committed the crime." *Id.* An indictment carries with it a presumption of regularity. *State v.*

*Penkaty,* 708 N.W.2d 185, 196 (Minn.2006). When challenging an indictment, the defendant "bears a heavy burden," and only in "rare case[s]" will an indictment be invalidated. *Lynch,* 590 N.W.2d at 79. This heavy burden is heightened when "the defendant has been found guilty beyond a reasonable doubt following a fair trial." *Id.* If the State fails to disclose exculpatory evidence to the grand jury, the indictment must be dismissed if "the evidence would have materially affected the grand jury proceeding." *Id.* (citing *State v. Moore,* 438 N.W.2d 101, 105 (Minn.1989)). This determination is made in light of "all of the evidence that the grand jury received." *Id.*

Miller contends that the indictment should have been dismissed because the grand jury was not informed of (1) Anderson's and Ridlon's plea agreements with the State; (2) the full extent of the involvement of Anderson and Ridlon in Holappa's death; and (3) Sam Miller's plea agreement with the State.

*Anderson's and Ridlon's Plea Agreements*

Miller argues that the indictment should be dismissed because the grand jury was not informed of Anderson's and Ridlon's plea agreements with the State. The record reflects that the State solicited some testimony at the grand jury proceeding from Anderson and Ridlon regarding their guilty pleas. The State asked Anderson and Ridlon three questions that established that each had pleaded guilty for his role in Holappa's kidnapping and that both Ridlon and Anderson were awaiting sentencing. The State did not solicit testimony that Anderson's plea agreement included a provision that the State would not seek a first-degree murder indictment against him or that Ridlon's plea was pursuant to an agreement that the State would dismiss a second-degree murder charge.

In *Lynch,* we considered a defendant's claim that the grand jury was not informed of inducements given to three witnesses for their cooperation. *Lynch,* 590 N.W.2d at 79. One witness received $590 in relocation expenses, was told that reward money might be available, had his bail vacated, and was released from confinement because of his cooperation. *Id.* at 77–78. Another witness was given reward money, was released from confinement because of his cooperation, and had his parole "restructured" because of his testimony. *Id.* at 78–79. A third witness obtained from a police officer a written request to the city attorney asking for dismissal of charges because of that witness's cooperation. *Id.* at 79. None of these inducements were disclosed to the grand jury. *Id.* But, the grand jury did know that the first witness "had not testified truthfully at his first appearance," had some involvement in the events which led to the victim's murder, had some agreement with the State and that the second witness had his parole restructured due to his cooperation. *Id.* at 79. In *Lynch,* we determined the undisclosed inducements would not have materially affected the grand jury proceedings "in light of what the grand jury did know about these three witnesses and the rest of the evidence presented." *Id.* Moreover, we considered the fact that the inducements these witnesses received were disclosed to the petit jury, defense counsel used them to impeach those witnesses at trial, and the defendant was found guilty beyond a reasonable doubt. *Id.*

Here, like *Lynch,* the grand jury knew that Anderson and Ridlon had some involvement in the events that led up to Holappa's murder; the grand jury heard that Anderson and Ridlon pleaded guilty to some crime in connection with Holappa's kidnapping. Although the grand jury

was not told whether their cooperation would result in more lenient sentences, the grand jury did hear that Anderson and Ridlon were both awaiting sentencing at the time of their appearances before the grand jury. Although the State should have completely disclosed to the grand jury the full terms of Anderson's and Ridlon's plea agreements, we conclude that these inducements would not have materially affected the grand jury proceedings against Miller, given what the grand jury did know about Anderson and Ridlon.

Furthermore, our decision is supported by the verdict. Because Miller was found guilty by a petit jury following a trial his "heavy burden" in challenging the indictment is heightened. *Lynch*, 590 N.W.2d at 79. The jury heard all of the evidence related to Anderson's and Ridlon's plea agreements: the jury heard the specific charge to which each had pleaded guilty, that each plea was under an agreement with the State, that cooperation and testimony were required under that agreement, and that in return the State agreed to not seek a first-degree murder indictment against Anderson and to dismiss a second-degree murder charge against Ridlon. In both instances, defense counsel used this information to impeach the witness on cross-examination. Because (1) the petit jury heard testimony regarding all of the inducements Anderson and Ridlon received in exchange for their testimony, (2) this information was used to impeach them at Miller's trial, and (3) the jury found Miller guilty beyond a reasonable doubt, we conclude that the district court did not err when it denied Miller's request to dismiss the indictment on this ground.

*Anderson's and Ridlon's Involvement in the Murder*

■ Miller also contends that the indictment should be dismissed because the grand jury was not informed of the full extent of Anderson's and Ridlon's involvement in Holappa's murder. Miller argues that Ridlon and Anderson could have been charged with murder because their involvement constituted aiding and abetting the murder.

Ridlon's testimony before the grand jury revealed that he struck Holappa once, towed the Mitsubishi off of his property, and eventually led the police to the car. Ridlon's testimony was more detailed at trial, but the evidence did not indicate that Ridlon had any greater involvement in Holappa's death than was revealed to the grand jury.

Anderson's testimony before the grand jury downplayed his involvement in the events surrounding Holappa's murder. For instance, Anderson testified that outside the Gladiator Bar, Holappa "tripped" in the street and that Anderson then "helped him in the car." Upon further questioning by the State, Anderson admitted that he had tripped Holappa but still stated that he "helped" Holappa into the car. Additionally, Anderson testified that during the assault on Holappa in Ridlon's garage, he was "trying to kind of mediate" between Miller and Holappa. At trial, however, other witnesses testified that Anderson punched Holappa outside of the Gladiator Bar. Additionally, the jury heard testimony from other witnesses that Anderson took part in assaulting Holappa in Ridlon's garage.

■ A grand jury's role is to determine whether there is "probable cause to believe the accused has committed the crime." *Lynch*, 590 N.W.2d at 79. Even if Ridlon and Anderson could have been charged with murder, there was still probable cause to believe that Miller committed first-degree murder. Considering the proceedings on the whole, the grand jury heard testimony from Anderson, Hill, Rid-

lon, Sam Miller, Dunn, and Frazee, as well as from the lead BCA investigator and the medical examiner. In light of the entirety of the grand jury proceedings, there was sufficient evidence to indict Miller for first-degree murder, even if the grand jury did not hear the full details of Anderson's involvement in the crime.

Moreover, Miller's "heavy burden" in challenging an indictment is heightened in this case because he was found guilty following a full trial on the merits. *Id.* The evidence at trial revealed the extent of Ridlon's and Anderson's involvement in the crime. As in *Lynch,* the fact that the petit jury heard this information and still found Miller guilty beyond a reasonable doubt may be considered in assessing the indictment and is an "even more compelling" reason to uphold the indictment. *E.g., State v. McDonough,* 631 N.W.2d 373, 386 (Minn.2001). Even though Anderson's testimony before the grand jury downplayed his involvement in the crime, the petit jury heard all of the evidence related to his involvement and still found Miller guilty of first-degree murder.

### Sam Miller's Plea Agreement

Miller also argues that the indictment should be dismissed because the grand jury was not informed of Sam Miller's plea agreement with the State. The postconviction court held an evidentiary hearing and found that there was not a plea agreement between Sam Miller and the State, a finding that is analyzed more fully in Part IV of this opinion. But, even if we were to conclude that the State failed to disclose a plea agreement between Sam Miller and the State, like the witnesses in *Lynch* who were given a favorable recommendation by the police officer or were released from confinement due to their cooperation, we conclude such a plea agreement between Sam Miller and the State would not have materially affected the grand jury proceedings. *See Lynch,* 590 N.W.2d at 79.

For all the forgoing reasons, we hold that the district court did not err when it denied Miller's pre-trial motion to dismiss the grand jury indictment.

### II.

 Miller's second claim is that the district court committed reversible error by excluding evidence of Anderson's prior bad acts. Miller sought to admit this evidence as part of his defense theory that Anderson was an alternative perpetrator. We will reverse evidentiary rulings "only if the district court clearly abused its discretion and the defendant was thereby prejudiced." *State v. Caine,* 746 N.W.2d 339, 349 (Minn.2008). A defendant is prejudiced by an evidentiary ruling when "there is a reasonable possibility that without the error 'the verdict might have been more favorable to the defendant.'" *Id.* (quoting *State v. Richardson,* 670 N.W.2d 267, 277 (Minn.2003)). The defendant has the burden to establish both that the district court abused its discretion and that the error was prejudicial. *State v. Vance,* 714 N.W.2d 428, 436 (Minn.2006).

 Evidence that an alternative perpetrator may have committed the crime is admissible if the evidence "has an inherent tendency to connect the alternative party with the commission of the crime." *State v. Jones,* 678 N.W.2d 1, 16 (Minn. 2004). If this threshold requirement is met, evidence of other crimes, wrongs, or bad acts committed by an alleged alternative perpetrator ("reverse-*Spreigl*" evidence) is admissible if the defendant also shows "(1) clear and convincing evidence that the alleged alternative perpetrator participated in the reverse-*Spreigl* incident, (2) that the reverse-*Spreigl* incident is relevant and material to defendant's case; and (3) that the probative value of

the evidence outweighs its potential for unfair prejudice." *Id.* at 16–17. Finally, such evidence must also "comply with procedural and evidentiary rules." *State v. Scanlon,* 719 N.W.2d 674, 684 (Minn.2006).

At trial, for the purpose of establishing that Anderson was the alternative perpetrator, Miller moved to admit as evidence certain prior bad acts by Anderson through the testimony of three witnesses: Ryan Moats, Casey Moravitz, and Jesse Lundeen. The district court allowed Moats to testify that Anderson once assaulted him but excluded proffered testimony by Moravitz and Lundeen.

*Moravitz's Proferred Testimony*

In a statement given to a defense investigator, Moravitz stated that she first met Anderson on July 23, 2004, at a Gilbert bar. At that time, Anderson told her about "duct taping some guy to a chair in a garage … and beating him with a golf club." The district court excluded Moravitz's proffered testimony because the court concluded the testimony did not establish by clear and convincing evidence that Anderson participated in the incident.

■■■ The clear and convincing standard "requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *State v. Kennedy,* 585 N.W.2d 385, 389 (Minn.1998) (internal quotation marks omitted). This standard is "met when the truth of the facts sought to be admitted is highly probable." *Id.* In the context of reverse-*Spreigl* evidence, the evidence must "clearly show the person's direct participation in the other crime." *State v. Stewart,* 643 N.W.2d 281, 297 (Minn.2002) (citing *State v. Shannon,* 583 N.W.2d 579, 584 (Minn.1998)). We have found evidence to be clear and convincing "on the strength of a conviction, a victim's clear identification of the defendant as the assailant, or the defendant's own confession of participation in the inci-

dent." *State v. Profit,* 591 N.W.2d 451, 464 (Minn.1999) (quoting *State v. Shannon,* 583 N.W.2d 579, 584 (Minn.1998)).

In *State v. Ness,* 707 N.W.2d 676 (Minn. 2006), the district court admitted testimony that the defendant had abused the witness as a child over 25 years earlier when the defendant was the witness's school principal. *Id.* at 682. On appeal, we held that the court's conclusion that the *Spreigl* evidence was clear and convincing was not an abuse of discretion because the witness's testimony was corroborated in part by the record. *Id.* at 686. Furthermore, we concluded that the court's credibility assessment of the witness, who "drove over 1,500 miles to testify and faced the possibility of losing his employment because of his absence" was an appropriate factor in determining whether the evidence was clear and convincing. *Id.*

■■■ Here, the district court concluded that there was not clear and convincing evidence that Anderson committed the prior bad act because Moravitz did not know when or where the alleged incident occurred or who the victim was. This situation is distinguishable from *Ness* wherein the identity of the prior bad act victim, the location of the offense, and the general timeframe were all known and testified to by the alleged victim himself, and the testimony was corroborated in part by the record. Furthermore, the court suggested that Moravitz was not credible because she is a friend of Miller's girlfriend and the first time Moravitz made her statement was at the end of August 2005, more than a year after she allegedly heard Anderson's statements and just a few weeks before trial. Such credibility determinations are appropriate under the first prong of the reverse-*Spreigl* analysis, *Ness,* 707 N.W.2d at 682, even in cases of purported confessions by the person who

committed the prior bad act, *e.g., Profit*, 591 N.W.2d at 465. We hold that the court did not abuse its discretion in excluding Moravitz's proffered testimony because it did not meet the first prong of the reverse-*Spreigl* analysis.

*Lundeen's Proferred Testimony*

In his statement to a defense investigator, Lundeen recounted (1) an assault by Anderson on Chad Rowen; (2) an assault by Anderson in which he burned a man; (3) an assault by Anderson on Ryan Moats; and (4) an assault by Anderson and Lundeen on Craig Thomas. The district court excluded all of Lundeen's proffered testimony.

■ Lundeen's proffered testimony regarding Anderson's assault on Rowen was that Rowen told Lundeen that Anderson bound him with duct tape and assaulted him. The district court concluded that this statement was inadmissible hearsay and that there was not clear and convincing evidence of the assault. We likewise conclude that Lundeen's proposed testimony regarding Rowen's statement is hearsay that does not fall within any exception. Therefore, we hold that the court did not abuse its discretion in concluding that Lundeen's testimony regarding Rowen's statement is inadmissible hearsay.

■ Lundeen also proffered testimony that Anderson told him about burning a man to get money from the man. The district court concluded that this statement was inadmissible hearsay, that there was no information as to the timing or location of the incident, and that the there was no corroboration by the assault victim. Lundeen's proferred testimony regarding Anderson's statements, however, could have been admissible as a statement against penal interest under Minn. R. Evid. 804(b)(3), which is a ground the court did not address. But Lundeen's tes-timony must still meet the clear and convincing evidence standard to be admissible. Lundeen had no firsthand knowledge of the incident. *See e.g., State v. Mayhorn*, 720 N.W.2d 776, 784 (Minn.2006) (holding that the evidence was not clear and convincing, in part, because the witness had "no firsthand knowledge" of the incident). Because Lundeen did not know when or where the assault occurred, who the victim was, or how Anderson committed the assault, we hold that the court did not abuse its discretion when it concluded that Lundeen's testimony did not meet the clear and convincing evidence standard.

■ Miller also offered testimony by Lundeen recounting Moats's description of being assaulted by Anderson. The district court concluded that Lundeen's statement was inadmissible hearsay. Miller argues that this statement is not hearsay because it was not offered to prove the truth of the matter asserted but was instead offered as corroboration of Moats's testimony. Minn. R. Evid. 801(d)(1)(B) provides that a prior out-of-court statement by a witness that is consistent with the witness's trial testimony is not hearsay if the statement is "helpful to the trier of fact in evaluating the declarant's credibility as a witness." But we have held that before such statements are admissible that "the witness's credibility must be challenged and the statement must bolster the witness's credibility with respect to the challenged aspect." *State v. Manley*, 664 N.W.2d 275, 288 (Minn.2003); *see also State v. Farrah*, 735 N.W.2d 336, 344 (Minn.2007). Here, the jury heard testimony from Moats, but the record indicates that the State did not attack Moats's credibility on cross-examination. Therefore, because the State did not challenge Moats's credibility, we hold that the district court did not abuse its discretion when it excluded as inadmissible hearsay Lundeen's proffered testimony recounting

Moats's out-of-court description of Anderson's assault on Moats.

Miller also offered a statement by Lundeen that in March 2003, Lundeen asked Anderson to help him collect money from Craig Thomas. Lundeen stated that Anderson helped him assault and take money from Thomas, and that he paid Anderson half of the money they took from Thomas. The district court excluded this testimony, apparently on the ground that it did not meet the clear and convincing evidence standard, noting that Lundeen's statement was first given less than two weeks before trial, that the incident was never reported to law enforcement by the victim, and that there is no testimony by the victim. Although Lundeen had first-hand knowledge of the assault on Thomas, the court made a credibility determination regarding this testimony. We hold that this determination was not an abuse of discretion.

Moreover, even if the district court abused its discretion in excluding Lundeen's testimony regarding Thomas, the error is reversible only if "there is a reasonable possibility that without the error the verdict might have been more favorable to the defendant." *Caine*, 746 N.W.2d at 349 (internal quotations marks omitted). Here, even though the jury did not hear Lundeen's testimony about Anderson's prior assault on Thomas, the jury did hear testimony from Moats, who testified firsthand to being assaulted by Anderson, and the jury heard testimony that Anderson participated in the kidnapping of Holappa, participated in assaulting Holappa, had traded his debt collection services to pay off his own drug debts, and had used violence to collect those debts in the past. Because the jury heard evidence that implicated Anderson in Holappa's kidnapping and death, as well prior assaults, we conclude that it is not likely that testimony by Lundeen would have resulted in a more favorable verdict for Miller.

Because we hold that the district court did not abuse its discretion in excluding certain alternative perpetrator evidence and the exclusion of the remaining alternative perpetrator evidence was harmless error, we conclude that Miller is not entitled to a new trial based on Miller's claim that the district court erred by excluding evidence of Anderson's prior bad acts.

## III.

Miller's third claim is that the district court erred by admitting hearsay statements made by Holappa before his death. We will reverse a district court's evidentiary ruling "only if the district court clearly abused its discretion and the defendant was thereby prejudiced." *Caine*, 746 N.W.2d at 349. Prejudice occurs when "there is a reasonable possibility that without the error 'the verdict might have been more favorable to the defendant.'" *Id.*

At trial, Miller objected to the admission of statements contained in a letter Holappa wrote to his sister.[1] The district court allowed testimony by Holappa's sister regarding the contents of the letter under the state of mind exception to the hearsay rule, Minn. R. Evid. 803(3). Rule 803(3) provides that the following statements are not excluded by the hearsay rule:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling,

---

1. Miller also objected to testimony that Holappa told a friend he did not know why he was in Cotton the morning after he stole Miller's truck and that Holappa stated to a friend "[a]t least I know [Miller] can't hit very hard." On appeal, Miller made no claim that admission of either of these statements prejudiced him.

pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Minn. R. Evid. 803(3).

Holappa's letter contained several statements that his sister summarized in her testimony. She testified that Holappa wrote that (1) he had taken Miller's truck with an ATV and a backpack containing money and drugs; (2) he did not remember stealing the truck, but woke up talking to bushes that he thought were his friends; (3) he was scared of Miller; (4) he had a plan to get out of the area; (5) he was going to try to pay Miller back but did not think he would be able to do so; and (6) he planned to go look for the ATV when he was done writing the letter.

Statements (1) and (2) were descriptions of events in the past and are, therefore, outside the scope of the state of mind exception. But we conclude the admission of these statements did not prejudice Miller because other witnesses, including Anderson, Hill, Ridlon, and others, each testified to either Holappa's theft of Miller's truck and the backpack containing money and drugs or to Holappa's debt to Miller. Statements (4), (5), and (6) all described Holappa's intentions and plans, which we conclude are admissible under the state of mind exception, Minn. R. Evid. 803(3).

Statement (3) describes Holappa's fear of Miller. Although a declarant's emotion is admissible under Minn. R. Evid. 803(3), we have specifically restricted the admissibility of a victim's statements regarding his fear of the defendant. We have stated that the victim's state of mind must be relevant to be admissible, and "[o]rdinarily, a homicide victim's state of mind is *not* relevant to whether the defendant committed the crime." *State v. DeRosier*, 695 N.W.2d 97, 105 (Minn.2005) (emphasis added). The victim's state of mind may be relevant when "the defendant raises the defense of accident, suicide, or self-defense." *Id.* (citing *State v. Bauer*, 598 N.W.2d 352, 367 (Minn.1999)). Here, because Miller raised no such defense, Holappa's statement that he feared Miller was not relevant, and therefore we hold that the district court erred when it admitted this evidence.

Although the district court erred in admitting the statement that Holappa feared Miller, the error is reversible only if "there is a reasonable possibility that without the error the verdict might have been more favorable to the defendant." *Caine*, 746 N.W.2d at 349 (internal quotations omitted). The prejudice that may result from admitting irrelevant statements of a victim's fear is that the jury will "consider the victim's statements of fear as a true indication of a defendant's intentions or actions." *Bauer*, 598 N.W.2d at 367.

Considering all the evidence at trial, we conclude that there was more than sufficient other evidence from which the jury could have inferred that Holappa was afraid of Miller. The evidence at trial established that Holappa took a truck, drugs, money, and an ATV from Miller; that Miller was angry about Holappa's theft; and that Miller was associated with individuals known to use violence to collect drug debts. In the context of the entire trial, we conclude that the verdict would not have been more favorable to Miller without Holappa's statement to his sister that he feared Miller. We, therefore, hold that the district court's error in admitting evidence that Holappa feared Miller was harmless.

## IV.

 Miller's fourth claim is that he was denied a fair trial because of discovery violations by the State. Whether the State has committed a discovery violation is an issue of law, which we review de novo. *State v. Scanlon,* 719 N.W.2d 674, 685 (Minn.2006). We review the factual findings made by a postconviction court for sufficiency of the evidence. *Brown v. State,* 746 N.W.2d 640, 641–42 (Minn.2008). Generally we will not grant a new trial without a showing of prejudice to the defendant. *Scanlon,* 719 N.W.2d at 685. A new trial is warranted when the State's discovery violations "viewed in the light of the whole record, appear[ ] to be inexcusable and so serious and prejudicial that the defendant's right to a fair trial was denied." *Id.* We deem discovery violations harmless if the jury's verdict "was surely unattributable to the error." *Id.* (internal quotation marks omitted).

Miller petitioned for postconviction relief alleging that the State failed to disclose exculpatory evidence, specifically a plea agreement between the State and Sam Miller. The postconviction court held an evidentiary hearing on the matter, and additional potential discovery violations emerged. The court found that (1) the State violated the rules of discovery by failing to provide written summaries of contacts between the BCA and Sam Miller; and (2) the State violated the rules of discovery by inadvertently failing to disclose Sam Miller's prior felony record; but the court also found that (3) there was "no express or implied deal between Sam Miller and the State." The court concluded that Miller was not entitled to relief because the two violations that it found had occurred did not prejudice him. Miller

argues that the court abused its discretion when it found that there was no deal between Sam Miller and the State and that the State's violations did not prejudice Miller and deprive him of a fair trial.

*Written Summaries of BCA Contacts with Sam Miller*

 Minnesota Rule of Criminal Procedure 9.01 requires that the State disclose "any relevant written or recorded statements which relate to the case." We have held that the mandatory language of Rule 9.01 requires the State to disclose the substance of every oral statement by a witness that relates to the case, even if the witness does not disclose new or different information from previously disclosed statements. *State v. Palubicki,* 700 N.W.2d 476, 490 (Minn.2005).[2] In *Palubicki,* we concluded that the failure to disclose any contacts with witnesses was a discovery violation, but we held that the failure to disclose contacts in which no new information was disclosed by a witness did not result in prejudice and, therefore, did not warrant a new trial. *Id.* at 490–91.

 Here, the testimony at the evidentiary hearing reflects that the two lead BCA agents did not memorialize in writing all of their contacts with Sam Miller when the contacts were "general conversation[s] of keeping in contact with [Sam Miller]." Like *Palubicki,* the failure to provide written summaries of contacts with Sam Miller violated Minn. R.Crim. P. 9.01, but the failure does not require a new trial because nothing new regarding the case was discussed during those contacts.

*Sam Miller's Criminal Record*

The postconviction court concluded that the State inadvertently violated Minn.

---

**2.** The vast majority of the investigation into Holappa's murder took place before our July

2005 *Palubicki* decision.

R.Crim. P. 9.01 when it provided Miller with incomplete copies of Sam Miller's criminal history. On appeal, Miller argues that providing the incomplete criminal history violates both Rule 9.01 and the State's disclosure obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Minnesota Rule of Criminal Procedure 9.01 requires that

> The prosecuting attorney shall disclose to defense counsel the names and addresses of the persons intended to be called as witnesses at the trial together with their prior record of convictions, if any, within the prosecuting attorney's *actual knowledge.*

Minn. R.Crim. P. 9.01 (emphasis added). Here, the record indicates that the prosecutor followed his office's usual practice for obtaining criminal history records for witnesses in criminal cases, but that for some unknown reason Sam Miller's criminal history printout provided by the State did not contain his four prior felony convictions. The evidence at the hearing did not establish that the State did not make the "reasonable effort[s]" required under Rule 9.01. *State v. Jackson*, 346 N.W.2d 634, 638 (Minn.1984).[3] While we are troubled that this type of oversight could occur, we conclude that the record supports the district court's conclusion that the error was inadvertent.

The State's obligation to disclose exculpatory evidence, however, extends beyond Rule 9.01. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires the State to disclose all exculpatory evidence, including impeachment evidence. *Pederson v. State*, 692 N.W.2d 452, 459 (Minn.2005). A *Brady* violation occurs when evidence that is favorable to the accused is suppressed, either willfully or inadvertently by the State, resulting in prejudice to the accused. *Id.* Unlike Rule 9.01, *Brady* does not require that the suppressed evidence be within the prosecuting attorney's actual knowledge.

Here, Sam Miller's prior felony convictions were exculpatory because the convictions could have been used for impeachment purposes. This exculpatory evidence was inadvertently not disclosed to Miller. For a *Brady* violation to have occurred, however, Miller must have been prejudiced by this lack of disclosure. *Pederson*, 692 N.W.2d at 459. Here, even without information regarding Sam Miller's prior felonies, Sam Miller's credibility was successfully impeached at trial. He admitted to lying to the police and to being unreliable because he was high on methamphetamines when the events took place. Because Sam Miller was impeached, even without using his criminal record, we conclude that Miller was not prejudiced by the State's inadvertent lack of disclosure.

### Sam Miller's Purported Plea Agreement with the State

Miller contends that Sam Miller had a plea agreement with the State that a felony charge of fleeing a police

---

3. In a case decided after *Brady*, we interpreted Rule 9.01 as "(a) requiring the prosecution to disclose all records within its possession of prior convictions of state's witnesses and (b) providing for court orders requiring the prosecution to make a reasonable effort to obtain the records in those situations where the prosecution does not have the records but the defendant specifically requests them and it appears that the records will be material to the defense." *State v. Jackson*, 346 N.W.2d 634, 638 (Minn.1984). The language of the 1984 version of Minn. R.Crim. P. 9.01 is substantively identical to the current rule. This interpretation is consistent with the phrase "actual knowledge" in Rule 9.01. The State, however, could be in compliance with Rule 9.01 but still violate the rule of *Brady*.

officer would be dismissed in exchange for his cooperation in the Holappa murder investigation. Miller argues that the State's failure to disclose this agreement prejudiced him. The State is obligated to disclose plea bargains made with witnesses in exchange for their testimony. *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). A plea bargain in exchange for testimony is exculpatory evidence under *Brady* because it can be used to impeach a witness. *Id.; U.S. v. Bagley*, 473 U.S. at 667, 676, 105 S.Ct. 3375 (1985). But when the State fails to disclose a witness's plea bargain, a new trial is only warranted if a reasonable jury would not have reached the same verdict had it been told of the plea bargain. *State v. Smith*, 541 N.W.2d 584, 588 (Minn.1996).

■■■■■ "Determining what the parties agreed to in a plea bargain is a factual inquiry for the postconviction court to resolve," but any interpretation and enforcement of agreements involving issues of law are reviewed de novo. *State v. Rhodes*, 675 N.W.2d 323, 326 (Minn.2004). We review a postconviction court's decision to deny relief for an abuse of discretion. *Dukes v. State*, 621 N.W.2d 246, 251 (Minn. 2001). Here, after holding an evidentiary hearing, the court determined "there was no express or implied deal between Sam Miller and the State." Because this is "a factual inquiry for the postconviction court to resolve," we give the court's findings deference.

■■■■ Even if we conclude that an arrangement existed between Sam Miller and law enforcement that should have been disclosed, we conclude that the jury's verdict would not have been more favorable to Miller had Miller known the State had dismissed the felony charge against Sam Miller. The most important evidence Sam Miller provided at trial was recount-ing Miller's statements that Miller was late in arriving to the dirt biking location because he "had something to take care of" and that he had "emptied a clip in [Holappa]." However, if Sam Miller had an agreement with the State, such an agreement would have had limited impeachment value on the credibility of these statements because Sam Miller recounted these statements to the police before he had *any* agreement with the police. Furthermore, Sam Miller did not volunteer these statements during his testimony and had to be confronted with his prior statements on direct examination. Moreover, any agreement Sam Miller had with the State did not require him to testify; in fact, by the time he testified, the charge in an unrelated case had already been dismissed. Finally, Sam Miller's credibility was successfully impeached at trial. He admitted to lying to the police and to being unreliable because he was high on methamphetamines when the events took place. For all of these reasons, we conclude it is unlikely that the jury's verdict would have been more favorable had the Miller known the State had dismissed Sam Miller's felony charge. Therefore, we hold that the postconviction court did not err in concluding that Miller was not denied a fair trial due to discovery violations by the State.

## V.

■■■ Miller's fifth claim is that the State committed misconduct when the State did not correct false testimony given by Sam Miller. Miller argues that Sam Miller testified falsely at trial when he stated that he had acted as a police informant only one time because Miller claims that Sam Miller in actuality had acted as an informant "four or five times." A defendant is entitled to a new trial based on false testimony given at trial if the *Larrison* test is satisfied. *Larrison v. United*

*States,* 24 F.2d 82, 87–88 (7th Cir.1928); [4] *Pippitt v. State,* 737 N.W.2d 221, 227 (Minn.2007) (noting that the *Larrison* applies to instances when a court reviews an allegation that false testimony was given at trial).

Here, the postconviction court concluded that Sam Miller's testimony was not false, but instead was "a matter of context." The relevant part of the testimony on cross-examination is:

Q: Your main interest when you were talking to law enforcement on July 29th, 2004, was to get out of jail, wasn't it?

A: Yeah.

Q: You were trying to tell them whatever they wanted to hear in order to get out of jail; weren't you?

A: Yeah.

Q: And you told law enforcement things in the past in order to get out of jail; haven't you?

A. Yeah.

. . . .

Q: Do you recall talking with police officers on July 29th, 2004?

A. I just remembered talking. I don't know the dates.

Q. Okay. Do you recall saying that, "I'm a reliable informant for them. I work with the cops. I'm a reliable informant for them." Do you recall saying that to them?

A. Something like that.

Q. Have you been a reliable informant for the police in the past?

A. One time.

The record reflects that Sam Miller cooperated with the Eveleth Police Department following his arrest in February 2004 on the felony charge of fleeing a police officer. Four months later at the end of July 2004 after Holappa's disappearance, Sam Miller was arrested on suspicion of aiding and abetting an offender. Sam Miller was questioned by the BCA on July 29, 2004, after this arrest. This July 29 interrogation is what is referenced on cross-examination at trial. Approximately two weeks later, Sam Miller began cooperating with BCA narcotic investigations. However, as of the July 29, 2004, interrogation, the record establishes that Sam Miller had only acted as an informant one time for the Eveleth Police Department. Taken in context, Sam Miller's answer on cross examination that he had been a reliable informant one time in the past, is a truthful response which the prosecutor had no obligation to correct. Therefore, we hold that the State did not commit misconduct when it did not correct Sam Miller's testimony.

## VI.

 Miller's last claim is that his trial counsel was ineffective for failing to investigate Sam Miller's criminal history for the purposes of impeachment. On appeal, we review ineffective assistance of counsel claims *de novo. Carney v. State,* 692 N.W.2d 888, 890–91 (Minn.2005). We apply the two-part ineffective assistance of counsel test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Gates v. State,* 398 N.W.2d 558, 561 (Minn.1987). The first part of this test requires that the petitioner prove that "counsel's representation fell

**4.** The *Larrison* test asks "(1) whether the district court is reasonably well-satisfied that the trial testimony given by a material witness was false; (2) whether without the false testimony, the jury might have reached a different conclusion; and (3) whether the petitioner was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." *State v. Ferguson,* 742 N.W.2d 651, 659 (Minn.2007).

below an objective standard of reasonableness." *Fields v. State,* 733 N.W.2d 465, 468 (Minn.2007) (quoting *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052). Objective reasonableness requires that counsel exercise "the customary skills and diligence that a reasonably competent attorney would [exercise] under the circumstances." *Leake v. State,* 737 N.W.2d 531, 536 (Minn. 2007). "There is a strong presumption that a counsel's performance falls within the wide range of 'reasonable professional assistance.'" *Fields,* 733 N.W.2d at 468 (quoting *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986)). The second part of the test requires that the petitioner prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Fields,* 733 N.W.2d at 468 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

Here, neither party disputes that the criminal history record disclosed by the State was inaccurate. Miller argues that his trial counsel should have done further investigation into any grounds on which to impeach Sam Miller, despite the lack of felony convictions on the printout provided by the State. The State argues that reliance on standard computerized printouts is reasonable and that Miller has not demonstrated any prejudice because Sam Miller was impeached at trial. We conclude that the evidence produced at the postconviction hearing does not suggest that defense counsel's performance was unreasonable. On the contrary, Miller's counsel testified that he followed his regular practice, and no evidence was produced to overcome the "strong presumption that a counsel's performance falls within the wide range of 'reasonable professional assistance.'" *Fields,* 733 N.W.2d at 468. We

therefore hold that Miller's trial counsel was not ineffective.

Affirmed.

MAGNUSON, C.J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.