**STATE of Minnesota, Respondent,**

v.

**Jeremy JACKSON, Appellant.**

**No. A08–0624.**

Supreme Court of Minnesota.

Aug. 6, 2009.

Lydia Villalva Lijó, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Donna J. Wolfson, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

GILDEA, Justice.

Jeremy Jackson appeals his convictions for first-degree murder committed for the benefit of a gang and attempted murder committed for the benefit of a gang. On appeal, Jackson argues that he is entitled to a new trial because of the State's discovery violations and because of evidentiary errors. We affirm.

This action arises from the shooting death of Gennaro Knox and the shooting of T.K. The State charged Jackson in connection with the shootings and a grand jury subsequently indicted him on 12 counts.[1] The State's theory at trial was that Jackson shot the victims in retaliation for the shooting of Markey, a fellow Bloods gang member. Jackson's first trial ended on September 4, 2007, when the jury was unable to reach a unanimous verdict. The second trial began on November 27, 2007. At Jackson's second trial, the State presented the following evidence.

At approximately 10 p.m. on October 5, 2006, Jackson learned that Markey had been shot and was hospitalized. Upon receiving this news, Jackson and several friends drove to Markey's house, the place of the shooting, in a Ford Explorer. James Morris, one of the friends accompanying Jackson, testified that they planned to "see what was happening" at Markey's house before going to the hospital. Markey's house was located near the intersection of 37th Street and Portland Avenue in Minneapolis, an area known to be territory of the "Bloods" street gang.

At Markey's house, Jackson and Morris met with Frankie, Xzavier, and Dominique. The five men speculated about who might be responsible for shooting Markey, and focused on three southside street gangs known as the "Bogus Boys," the "20s" and the "10s." After discussing Markey's shooting, the five men left Markey's house with a plan to go to the neighborhoods of the "Bogus Boys" and "20s" to "ride out,"

---

1. Jackson was indicted with the following 12 counts. Count 1: first-degree murder, Minn. Stat. § 609.185(a)(1) (2008) (premeditation); Count 2: first-degree murder committed for the benefit of a gang, Minn.Stat. §§ 609.185(a)(1), 609.229 (2008); Count 3: first-degree murder while committing a drive-by shooting, Minn.Stat. § 609.185(a)(3) (2008); Count 4: first-degree murder committed for the benefit of a gang while committing a drive-by shooting, Minn.Stat. §§ 609.185(a)(3), 609.229; Count 5: second-degree murder while committing a drive-by shooting, Minn.Stat. § 609.19 (2008); Count 6: second-degree murder committed for the benefit of a gang while committing a drive-by shooting, Minn.Stat. §§ 609.19, 609.229; Count 7: attempted murder, Minn.Stat. §§ 609.17, 609.185(a)(1) (2008); Count 8: attempted murder committed for the benefit of a gang, Minn.Stat. §§ 609.17, 609.185(a)(1), 609.229; Count 9: attempted first-degree murder while committing a drive-by shooting, Minn.Stat. §§ 609.17, 609.185(a)(3); Count 10: attempted murder committed for the benefit of a gang while committing a drive-by shooting, Minn.Stat. §§ 609.17, 609.185(a)(3), 609.229; Count 11: drive-by shooting, Minn. Stat. § 609.66, subd. 1(e)(b) (2008); and Count 12: drive-by shooting committed for the benefit of a gang, Minn.Stat. §§ 609.66, subd. 1(e)(b), 609.229.

meaning "shoot" to "retaliate." They departed in the same Ford Explorer in which Jackson and Morris had arrived.

*28th Street and Nicollet Shooting*

Morris sat in the driver's seat of the vehicle, Jackson sat in the front passenger seat, Frankie sat in the second row of seats behind Jackson, Xzavier sat behind Morris, and Dominique sat alone in the third row of seats. The men first drove to Morris's cousin's house, where Morris and Frankie stored a gun that they owned jointly. From there, they drove to "Bogus Boys" territory, looking for gang members. Morris testified that they spotted one person in an alley who they tried to "catch," but lost him and continued driving. Morris testified that they were heading south on Nicollet Avenue toward 28th Street when they saw three or four people standing at a bus stop whom they believed to be Bogus Boys. According to Morris, he slowed the Explorer without stopping, and Jackson fired the gun through the opening of the passenger-side window toward the people at the bus stop. Morris then sped off, making a left turn onto 28th Street and away from the bus stop. Morris did not believe the shots had hit anyone.

In fact, one person, T.K., suffered serious injury that night at the 28th Street and Nicollet bus stop. T.K. testified that she stood at that bus stop at about 10:20 p.m. on October 5, 2006, waiting for a bus and talking with two teenage boys, both of whom she believed to be members of the "Crips" street gang. Although she admitted that she was "high off crack" that night, T.K. testified that she saw a large, silver vehicle slow down at the corner as a "light-skinned guy" with braided hair pointed a silver gun out of the front passenger window. She said that she heard one shot and jumped to the ground, then realized she had been hit in the buttocks. The boys with whom she had been talking

scattered. Seeking help, T.K. got up and walked about a block to find a police officer, who then called an ambulance. A different officer who was called to the scene of the shooting testified that he found two shell casings at the corner near the bus stop, indicating that a gun had been fired at that location.

At the time of the shooting, M.K. was waiting in her car at the red stoplight on 28th Street when she observed three shots fired from the front passenger window of an SUV at the 28th Street and Nicollet bus stop. She had a clear view of the passenger side of the SUV. M.K. dialed 911 immediately and told the dispatcher that she saw a black male wearing a white t-shirt who was hanging out of the front passenger window and holding a gun. M.K. told the dispatcher that she saw the man fire the gun toward the bus stop. M.K. drove her car forward and followed the SUV for several blocks while she spoke to the dispatcher. She reported the license plate number to the dispatcher, and the dispatcher immediately determined that the vehicle was a Ford Explorer. M.K. also described the shooter to the dispatcher as a male, about 30 years old and 215 pounds, with darker skin and short hair, not braids.

*Elliot Street Shooting*

Morris testified that, as he drove down 28th Street after the bus stop shooting, Frankie was directing the group, and they were going toward "20s" territory. Morris said that they pulled up to a corner where K.H. was stopped in her vehicle on the cross street. K.H. testified at trial that she saw the SUV at that location just before 10:30 p.m. and observed Jackson in the front passenger seat. Upon seeing Jackson, K.H. immediately called home to tell her mother to make sure that her brothers were not in front of the house. K.H. knew that her brother, D.H., and

Jackson did not get along and, having seen Jackson so close to her home, she thought there was going to be a fight or shooting. K.H. testified that she received a return call from her mother two minutes later, telling her that someone had just been shot. K.H. returned home immediately and learned that Gennaro Knox, her 16–year–old neighbor, was dead at the scene.

Morris explained that when he saw K.H. in her car, he and the others were on their way to Elliot Street, at Frankie's direction. He testified that he knew D.H. and K.H. lived there, and that D.H. was a member of the "10s" gang. When the SUV turned onto Elliot Street, according to Morris, he saw two teenage boys, whom Morris believed were "20s or 10s" based on their location and the fact that they were outside late at night. Morris testified that both boys saw them as they came up the block, and that both boys paused and looked frightened. Morris said that he stopped the vehicle in front of the boys and that Jackson fired more than three shots out of the front passenger window. Morris said that one of the boys ran between two houses, but the other ran straight back toward the gate in front of the house. Morris stated that the victim was shot as he tried to climb over the gate. He said that everyone in the car saw the victim fall to the ground as they slowly started to drive away, and that they then sped off.[2]

D.W., who was on his way to a party with Knox when the shooting occurred, also testified. He explained that on the night of October 5, he and Knox had just stepped out of D.W.'s house on Elliot Avenue to get on their bicycles to ride to a

party. D.W. said that he and Knox left the house through the front door, walked across the front yard, opened the gate of the fence and closed it behind them, and stepped down several stairs to the public sidewalk. D.W. testified that he got on his bike and started riding, but Knox paused for a moment to fix the "doo rag" on his head. As D.W. started out on his bike, he heard gunshots—between five and seven—behind him. D.W. looked back and saw Knox run back up the steps and begin to open the gate of the fence. At that point, D.W. lost sight of Knox because D.W. had darted between two houses. When he came out, D.W. saw his parents in front of his house and Knox lying on the ground, still breathing. According to D.W., neither he nor Knox was affiliated with any gang. But D.W. was aware of gang activity on his street, and his residence on Elliot Avenue was next door to the residence where D.H., a member of the "10s" gang, lived.

The medical examiner who was called to the scene testified at trial that Knox was hit twice, once through the neck and once through the armpit into the chest. The wounds, according to the examiner, were consistent with witnesses' description that Knox had been falling to the ground, or that his body was parallel to the ground, when he was shot. Officer Andrew Hanson testified that he received a dispatch call to the Elliot Avenue shooting at 10:31 p.m. When Hanson arrived at the scene, he found several people upset by the events, and Knox, who was not responsive. Paramedics arrived shortly thereafter and pronounced Knox dead.

**2.** The police did not recover the gun used in the October 5, 2006 shootings. But Morris testified that he hid the gun in his own car overnight and then returned it to his cousin's house where he had picked the gun up the night before. The police did find two .40–

caliber discharged shell casings at the 28th Street and Nicollet bus stop and five of the same type of shell casings at the Elliot Street location. A forensic expert for the State testified that all of the casings were discharged from the same weapon.

According to Morris, after the shooting at Elliot Street, the men in the Ford Explorer went to a friend's house, and then later dropped off Xzavier at a location near 36th Street and Park Avenue. The four remaining men returned to Markey's house, at 37th Street and Portland Avenue, the location from which they had departed before the shootings. Friends were still gathered at the house. Several young women and another young man joined them, and the group used two vehicles—the Explorer and another—to drive around and do "stupid stuff" before heading to Hennepin County Medical Center (HCMC) to "check up on Markey." HCMC video surveillance showed the group of friends entering the hospital at about 11:50 p.m. Referencing several video frames shown at trial, Morris pointed out Jackson wearing a white t-shirt and identified and described everyone else in the group. After checking on Markey, the group left the hospital and dispersed back to their homes.

Dominique and Xzavier, passengers in the Ford Explorer on the night of the shootings, also testified. Both largely corroborated the seating arrangement and sequence of events described by Morris. Both also testified that Jackson was the shooter. Dominique testified that he is a member in the "Tyson's Mob" street gang. Xzavier admitted that he is a member in the "Bloods" street gang. Xzavier further stated that the five men had gone out seeking revenge for Markey's injury.

The State also introduced evidence of finger prints taken from the Ford Explorer. Two of Jackson's finger prints were found on the passenger-side front door, one on the exterior handle, and one on the exterior surface of the rear window frame. Frankie's finger print was found on the passenger-side rear door, front window frame, exterior surface. These findings are consistent with the seating arrangement in the Ford Explorer that the witnesses described.

### Evidence of Gang Affiliation

At trial, witnesses testified that Jackson is a member of the "Bloods" street gang, also known as the "30s" or "Rolling 30s Bloods," and is known in his neighborhood as "Pooh" or "Gangster Pooh." Morris also identified Jackson as being in and out of "Bloods CBT," a subgroup of the Bloods. Morris testified that he is known as "Poo-Pooh," and is a member of "Tyson's Mob," a gang closely affiliated with the Bloods. Morris explained that gang affiliation does not depend on colors as much as it depends on neighborhood. But he also said that Bloods identify with the color red and certain hand gestures. Morris identified the other men in the Ford Explorer on October 5, 2006, as belonging to either "Tyson's Mob" or the "Bloods."

According to Morris, members of the "Bloods" avoid using the letter "c" because of its affiliation with the "Crips." For example, a friend called "C.J." goes by "B.J.," and the phrase, "What's crackin'?" is repeated, "What's brackin'?" The word "cuz" (short for "cousin"), Morris said, is changed to "smuz."

The State introduced evidence that Jackson used the gang language described by Morris in letters that Jackson wrote while in jail. For example, Jackson called someone "Fire Bracker" and the friend named C.J., "B.J." Jackson also wrote "smuz" in place of "cuz," and he used the term "brack head." He signed one letter "C.B.T." The State also introduced evidence that Jackson associated with a "Lady CBT" on a social networking web page, that he was arrested for disorderly conduct on December 29, 2005, when he was observed making hand gestures and wearing red, and that he was observed by the police on July 21, 2006, with other known gang members.

In addition, the State's evidence showed that, on October 9, 2006, two days after his arrest but before he was charged, Jackson stated in a recorded phone call to his mother, "I better get out because if I don't, I know who told." When his mother asked who told, Jackson responded, "That bitch [K.H.].... that shit happened right in front of her house. That bitch told."

## The Defense Case

Jackson did not testify in his own defense or call any witnesses at trial. But in his cross-examination of witnesses and in closing, Jackson presented the theory that Frankie was the shooter on October 5, 2006. To support this theory, Jackson pointed to the testimony of the witness at the bus stop who said that the shooter appeared older and had dark skin, a description the defense argued was more consistent with Frankie than Jackson. There was also testimony that Frankie was the "most experienced guy" in the vehicle.

Jackson's counsel further highlighted that, before trial, Morris had told two other versions of his story, one of which he devised with Jackson when they were inadvertently placed in a holding cell together. When asked about his different versions on the witness stand, Morris explained that the first version was inaccurate because he was unsure of what his friends were saying. The second version, which placed Jackson in the driver's seat and blamed Frankie for the shooting, Morris admitted, had been fabricated by Morris and Jackson together. Morris testified that he decided to tell the truth when he believed it was inevitable that the truth would come out. When the defense suggested to Morris that he had to tell a particular story in order to get his plea deal, he responded, "Well, I know I'm going to tell the truth. That's my plea."

## Verdict and Sentence

The jury found Jackson guilty on all 12 counts of the indictment. The district court convicted him of first-degree murder committed for the benefit of a gang, Minn. Stat. §§ 609.185(a)(1), 609.229 (2008), and attempted murder committed for the benefit of a gang, Minn.Stat. §§ 609.17, 609.185(a)(1), 609.229 (2008). The district court sentenced Jackson to life in prison without release for the murder conviction. The court also imposed a consecutive 186–month prison sentence for the attempted murder conviction. This direct appeal followed.

## I.

Jackson first argues that he is entitled to a new trial because the State failed to provide him with complete discovery about witnesses once they were sworn to testify at trial. Jackson's argument relates to Minn. R.Crim. P. 9.01, subd. 3(2), which protects certain information about witnesses:

> The information relative to the witnesses and persons described in Rules 9.01, subd. 1(1), (2) shall not be subject to disclosure if the prosecuting attorney files a written certificate with the trial court that to do so may endanger the integrity of a continuing investigation or subject such witnesses or persons or others to physical harm or coercion, provided, however, that non-disclosure under this rule shall not extend beyond the time the witnesses or persons are sworn to testify at trial.

Shortly after Jackson's indictment, the State filed a Rule 9.01, subd. 3(2), certificate to withhold information about 10 witnesses the State believed would be in physical danger if their identities were dis-

closed.[3] On January 9, 2007, the district court issued an amended order relating to the prosecutor's certificate. In that order, the court directed the State to redact all identifying information concerning the protected witnesses from the materials given to the defense.

Approximately six weeks before Jackson's first trial, he moved the district court to compel discovery. On June 27, 2007, and in response to Jackson's motion, the district court ordered the State to immediately disclose to defense counsel the names, dates of birth, addresses, and criminal histories of the witnesses whose identities had previously been protected. In addition, approximately two weeks before trial, the court ordered the State to disclose "which confidential witness corresponds to each witness identified by letter in the redacted discovery" that had previously been provided to defense counsel, and to "make all unredacted discovery available to defense counsel for inspection only within the prosecutors' offices." Because the order also provided that Jackson could not learn about the substance of the testimony from these witnesses until they were sworn, the order stated that "[i]f defense counsel requires additional preparation in order to conduct an effective cross-examination of a confidential witness as a result of the late disclosure, defense counsel may request a recess from the Court."

Before his second trial, Jackson moved the district court to reconsider the June 27 discovery order. On December 3, 2007, the court denied Jackson's motion because the court found that the safety concerns justifying the limits on access to unredacted documents still existed.

On appeal, Jackson does not directly challenge as erroneous either the court's June 27 or its December 3 discovery order. Nor does Jackson contend, and the record does not support a finding, that the State violated either order. Jackson instead frames his argument as the State having committed discovery violations. According to Jackson, Rule 9.01, subd. 3(2) required that the State provide Jackson with unredacted copies of all materials regarding the protected witnesses, including statements these witnesses gave to police, as soon as the witnesses were sworn to testify at the first trial. Because the witnesses testified at his first trial, thereby meeting the requirements of Rule 9.01, subd. 3(2), Jackson argues that he was entitled to physical possession of the unredacted materials at the beginning of his second trial, before any witnesses were sworn to testify.

■ We apply a de novo standard of review to the interpretation of a procedural rule. State v. Dahlin, 753 N.W.2d 300, 305 (Minn.2008). The plain language of Minn. R.Crim. P. 9.01, subd. 3(2), requires that, when witnesses are sworn to testify at trial, the defendant is entitled to receive the information available under Minn. R.Crim. P. 9.01, subd. 1(1) and (2), including copies of witness statements.[4] The

---

3. Seven of those witnesses testified at the second trial. Of these seven, Dominique appears to have been the only one who did not also testify at the first trial. It is not clear whether the other six protected witnesses who testified at the second trial also testified at the first trial because the names of the witnesses who testified in the first trial are not part of the record. But given Jackson's argument, we assume that these six witnesses testified at both trials.

4. Minnesota Rules of Criminal Procedure, Rule 9.01, subd. 1, in relevant part, provides:

Disclosure by Prosecution Without Order of Court. Without order of court and except as provided in Rule 9.01, subd. 3, the prosecuting attorney on request of defense counsel shall, before the date set for Omnibus Hearing provided for by Rule 11, allow access at any reasonable time to all matters within the prosecuting attorney's possession

rule, however, does not specifically address the situation presented here, where witnesses are called to testify at a second trial, and where the district court has denied a motion requesting additional discovery before the start of the second trial.

■ But even if the State could be said to have violated the rule in this case, not every trial error warrants a new trial. *See State v. Scanlon,* 719 N.W.2d 674, 685 (Minn.2006) (reviewing discovery error under harmless error analysis). We have generally required that the defendant show both a discovery violation and that he suffered prejudice as a result of the discovery violation before ordering a new trial. *State v. Palubicki,* 700 N.W.2d 476, 489 (Minn.2005). Prejudice warrants a new trial only if a "reasonable probability exists that the outcome of the trial would have been different if the evidence" Jackson contends he should have received had been produced. *State v. Freeman,* 531 N.W.2d 190, 198 (Minn.1995) (applying harmless error analysis).

Jackson argues that we should not follow our general practice in this case, relying on cases where we have reversed convictions based on the State's violation of discovery rules without a further showing of prejudice. *See State v. Kaiser,* 486 N.W.2d 384, 386–87 (Minn.1992) (stating that a showing of prejudice is usually required to obtain a new trial after the State violates a discovery rule and that a new trial without a showing of prejudice is the exception). But *Kaiser* was an egregious case where the State took affirmative steps to interfere with the defendant's ability to gather information from potential witnesses. *See id.* at 387 (granting new trial because State told a witness with information about an alternative perpetrator to " 'keep her mouth shut' "); *see also Scanlon,* 719 N.W.2d at 687 (distinguishing *Kaiser* and requiring defendant to show prejudice from discovery violation). There was no such behavior in this case.

In the other cases Jackson cites, the State completely failed to disclose required information. *See State v. Schwantes,* 314 N.W.2d 243, 244–45 (Minn.1982) (granting new trial "in the interests of justice" despite the strength of the State's evidence because the State failed to notify the de-

---

or control which relate to the case and make the following disclosures:

(1) Trial Witnesses; Grand Jury Witnesses; Other Persons.

(a) The prosecuting attorney shall disclose to defense counsel the names and addresses of the persons intended to be called as witnesses at the trial together with their prior record of convictions, if any, within the prosecuting attorney's actual knowledge. The prosecuting attorney shall permit defense counsel to inspect and reproduce such witnesses' relevant written or recorded statements and any written summaries within the prosecuting attorney's knowledge of the substance of relevant oral statements made by such witnesses to prosecution agents.

(b) The fact that the prosecution has supplied the name of a trial witness to defense counsel shall not be commented on in the presence of the jury.

(c) If the defendant is charged by indictment, the prosecuting attorney shall disclose to defense counsel the names and addresses of the witnesses who testified before the grand jury in the case against the defendant.

(d) The prosecuting attorney shall disclose to defense counsel the names and the addresses of persons having information relating to the case.

(2) Statements. The prosecuting attorney shall disclose and permit defense counsel to inspect and reproduce any relevant written or recorded statements which relate to the case within the possession or control of the prosecution, the existence of which is known by the prosecuting attorney, and shall provide defense counsel with the substance of any oral statements which relate to the case.

fendant of a statement that "discredited defendant's alibi" that the prosecutor received after defense counsel examined the State's file); *State v. Zeimet*, 310 N.W.2d 552, 553 (Minn.1981) (granting new trial because the State, without any "justification," failed to disclose exculpatory, "important" evidence to the defense). Jackson has not alleged such flagrant abuse of discovery rules. Instead, the district court in this case issued detailed discovery orders taking into account the provisions of Minn. R.Crim. P. 9.01. Jackson does not challenge the orders on appeal and he concedes that he cannot show that the State violated the orders. We therefore conclude that our usual standard applies and that Jackson must show prejudice.

With respect to prejudice, Jackson complains that he should have received unredacted information about all seven witnesses, but his prejudice argument is limited to information about only one witness, Dominique, and as to that witness, Jackson claims prejudice from the State's failure to produce only one document. Specifically, Jackson contends that he was prejudiced by the State's failure to produce the unredacted transcript of a police interview taken of Dominique, who testified for the State in Jackson's second trial. Dominique did not testify in Jackson's first trial. But at the second trial, Jackson twice attempted to use a transcript that his defense counsel had prepared, apparently from the audio tape of Dominique's police interview that counsel had been given. Jackson claims that these two difficulties in the use of this transcript caused prejudice that warrants a new trial.

Jackson first points to difficulty in the cross-examination of Dominique. Jackson's counsel attempted to impeach Dominique by showing that, in the police interview, Dominique said that Jackson drove the vehicle, but in trial testimony Dominique said that Morris drove the vehicle. Dominique insisted that in the interview he had said that Morris was driving, and Dominique demeaned Jackson's counsel in front of the jury for what Dominique claimed was a mistake in the transcript counsel was using.

Jackson also claims that he was prejudiced based on his attempt to use the transcript defense counsel created of Dominique's police interview when cross-examining Sergeant Zimmerman, who conducted the interview. Jackson's counsel used the transcript to suggest that Zimmerman had put the thought in Dominique's head that Jackson had a gun in the Explorer on the night of the shootings. Zimmerman, before answering Jackson's questions, commented, "I just have one concern, sir. I don't know where this [transcript] came from."[5]

After reviewing these exchanges in the record, we conclude that Jackson has not met his burden to show that he was prejudiced by the State's alleged discovery violation. We reach this conclusion for several reasons. First, the June 27 order gave Jackson the opportunity to call for a recess as witnesses were sworn to testify so that Jackson could receive and review unredacted materials. Jackson made no request for a recess before or during Dominique's cross-examination or that of Zimmerman. Second, even without an unredacted transcript, Jackson was able to attack Dominique's credibility. *See State v. Hathaway*, 379 N.W.2d 498, 506 (Minn. 1985) ("[I]n light of the other available

---

5. Jackson moved for a mistrial after both instances in which he encountered problems with the transcript. The district court denied both motions, and Jackson does not challenge these rulings on appeal.

evidence with which the defendants were able to impeach, this error [withholding discoverable evidence from the defense] is harmless."). For example, Jackson's counsel asked Dominique whether he felt that Sergeant Zimmerman suggested that Jackson was the shooter. Jackson also pointed out that Dominique's statement to police that he went "directly home" contradicted his testimony that he went to the hospital with the others.

Third, the State's evidence against Jackson was strong. Morris, Dominique, and Xzavier all testified to the seating arrangement and that Jackson was the shooter at both locations. Forensic evidence suggested that the same gun fired at both locations. K.H., who knew Jackson, testified that she saw Jackson in the front passenger seat during the time between the shootings. M.K. and T.K., who witnessed the bus-stop shooting, testified that the shots were fired from the front passenger window of the Explorer. Finger print evidence confirmed that Jackson sat in the front passenger seat and that the alternative perpetrator suggested by the defense sat in the back seat.

In sum, there is no reasonable probability that the outcome at trial would have been different if Jackson had been able to

more completely impeach Dominique through use of an unredacted transcript of his police interview. *See Scanlon*, 719 N.W.2d at 686–87 (declining to award new trial for discovery violations where defendant did not demonstrate that he suffered prejudice from the violations); *Palubicki*, 700 N.W.2d at 489–90 (same); *State v. Thompson*, 273 Minn. 1, 32, 139 N.W.2d 490, 512 (1966) (concluding that the district court's denial of discovery of a witness's prior statement "may have been error," but that the error was harmless because even if the witness's testimony had been impeached, "we doubt that it would seriously affect the outcome of the case"). We therefore hold that even if Jackson is correct that the State violated Minn. R.Crim. P. 9.01, Jackson is not entitled to a new trial.[6]

II.

We turn next to Jackson's argument that the district court abused its discretion when it admitted four pieces of evidence introduced by the State to prove that Jackson committed crimes "for the benefit of a gang," an element included in 6 of the 12 counts in the indictment. *See* Minn.Stat. § 609.229, subd. 2 (crimes committed for the benefit of a gang).[7] The four pieces of

---

6. Jackson's brief also contends that he was not aware of a second police interview of Morris, but he has not demonstrated, or even argued, that he suffered prejudice from any alleged discovery violation with respect to this interview.

7. Under Minn.Stat. § 609.229, subds. 3 and 4, crimes committed for the benefit of the gang are subject to enhanced penalties. The statute describes the degree to which criminal activity must be consonant with gang activity:

   A person who commits a crime for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang, with the intent to promote, further, or assist in criminal conduct by

gang members is guilty of a crime and may be sentenced as provided in subdivision 3. Minn.Stat. § 609.229, subd. 2. A "criminal gang," moreover, is defined by the legislature according to its activities, its common identifiers, and a pattern of criminal activity by its members:

   As used in this section, "criminal gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, that:

   (1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9;

   (2) has a common name or common identifying sign or symbol; and

evidence are: (1) two photographs of a graffiti-covered t-shirt worn by Morris when he was arrested; (2) a web page picturing Jackson and his girlfriend; (3) police testimony about a prior contact with Jackson on July 21, 2006; and (4) police testimony about Jackson's arrest on December 29, 2005.

■■■ We will reverse a district court's evidentiary rulings only for clear abuse of discretion. *State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990). And even where the court's ruling is in error, a conviction will be reversed only if the errors " 'substantially influenced the jury to convict.' " *Id.* (quoting *State v. Carlson*, 268 N.W.2d 553, 561 (Minn.1978)); *State v. Nunn*, 561 N.W.2d 902, 907 (Minn.1997) ("Reversal is warranted only when the error substantially influences the jury's decision."). The defendant bears the burden on appeal of showing both the abuse of discretion and the prejudice justifying reversal. *Nunn*, 561 N.W.2d at 907.

We turn next to a discussion of each piece of evidence that Jackson challenges on appeal.

### A.

■■■ The State introduced two photographs of the t-shirt Morris was wearing when he was arrested on October 11, 2006. The t-shirt depicted symbols and letters showing "disrespect[ ]" to the "Bogus Boys," the "40s," the "20s," the "10s," and the police. The t-shirt also favorably highlighted the "30s," and Morris testified that he is not in the "30s," or "Rolling 30s Bloods," but that he is closely affiliated with them as a member of "Tyson's Mob."

Jackson argues that Morris's t-shirt is not relevant because it is not tied to the

October 5, 2006 shootings, and he contends that this case is like *State v. Grayson*, 546 N.W.2d 731, 737 (Minn.1996). There, we held that a hat relating to Malcolm X that police had seized from the defendant's home should not have been admitted at trial because it "had absolutely no connection with and played no role in" the murder. In this case, by contrast, the t-shirt corroborates Morris's testimony that he was in a gang, and it tends to show that his gang was linked with Jackson's gang. The t-shirt therefore is probative of whether the men in the Explorer on October 5, 2006 were united by a common name or identifying symbols. *See* Minn.Stat. § 609.229, subd. 1.

■■ Jackson also argues that, even if the t-shirt evidence is relevant, it is unnecessarily cumulative and unfairly prejudicial under Rule 403. We disagree. For evidence to be inadmissible under the balancing test of Rule 403, the potential for unfair prejudice or "considerations of ... needless presentation of cumulative evidence" must substantially outweigh the probative value of the evidence. Minn. R. Evid. 403. While Jackson argues that the photographs of the t-shirt were cumulative and unfairly prejudicial, he has not demonstrated that these considerations outweigh the probative value of the photographs. We therefore hold that the district court acted within its discretion by admitting the two photographs of Morris' gang-graffitied t-shirt.

### B.

■■■ The State presented a printed web page, titled "Lady CBT," from the social networking site called "Blackplanet.com." The image depicted Jackson and

(3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

Minn.Stat. § 609.229, subd. 1.

his girlfriend, both wearing red, the color witnesses said was affiliated with members of Jackson's gang, the Bloods. Jackson objected on foundation grounds, arguing that the image could have been altered using "Photoshop." The district court overruled Jackson's objection.[8] It is not clear from the record whether the State introduced the web page printout as a photograph or as a web page. It is also not clear from the record that the State established the proper foundation for this evidence. *See, e.g., LaCombe v. Minneapolis St. Ry. Co.*, 236 Minn. 86, 93, 51 N.W.2d 839, 844 (1952) (noting that the introduction of photographic evidence requires testimony that the image accurately depicts the conditions at issue); *Audi AG v. Shokan Coachworks, Inc.*, 592 F.Supp.2d 246, 277–78 (N.D.N.Y.2008) (finding web site evidence inadmissible where employee of the website with personal knowledge of website content did not authenticate it); *see also* Minn. R. Evid. 901 (discussing authentication and identification requirements).

But even if the district court abused its discretion in admitting the Blackplanet.com web page because it was admitted without a proper foundation, Jackson must still show that this error substantially influenced the jury's decision. *Nunn*, 561 N.W.2d at 907. Jackson admits that the State introduced a "cascade of evidence" to show that the crimes were committed for the benefit of a gang. In light of the other evidence of gang affiliation and the strong evidence of Jackson's guilt, we cannot say that the web page evidence substantially influenced the outcome of Jackson's trial. We therefore hold that Jackson is not entitled to a new trial on the basis of the admission of the printed web page.

## C.

■ The State presented evidence that on July 21, 2006, a police officer observed Jackson drinking beer near a vehicle with two other persons known to be members of the Bloods gang. The police searched the vehicle and found red clothing and a photograph. Jackson was not arrested or implicated in any wrongdoing. Admitting testimony about the July 21, 2006 incident, the district court reasoned that this evidence was relevant to show Jackson's association with a group that "engage[ ] in a pattern of criminal activity." *See* Minn. Stat. § 609.229, subd. 1.

Jackson argues that the July 21, 2006 incident was unfairly prejudicial. He also contends, in essence, that this incident is impermissible character evidence under Minn. R. Evid. 404(a) (character evidence not admissible for purpose of proving conformity therewith) because it paints Jackson in a bad light.[9]

---

**8.** On appeal, Jackson also argues that the evidence was not relevant. It does not appear that Jackson objected on relevancy grounds at the district court. We therefore will not consider this argument. *State v. Bailey*, 732 N.W.2d 612, 623 (Minn.2007) (concluding that new grounds offered on appeal to support argument that district court made evidentiary error would not be considered).

**9.** Minn. R. Evid. 404(b) allows the use of past wrongs for particular purposes, including motive, provided that the State gives proper notice and the evidence is relevant:

Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence shall not be admitted unless (1) the prosecutor gives notice of its intent to admit the evidence consistent with the rules of criminal procedure; (2) the prosecutor clearly indicates what the evidence will be offered to prove; (3) the other crime, wrong, or act and the participation

In *State v. Ferguson,* 581 N.W.2d 824, 834 (Minn.1998), we said that, when the State presented a theory of a gang-related murder, the defendant's gang affiliation "was essential to the state's proof of motive." Consequently, we concluded that the district court did not abuse its discretion by admitting photographs of gang graffiti and testimony explaining it, despite the prejudicial nature of the material. *Id.* at 834–35. The district court in *Ferguson* also had instructed the jury that the defendant was not on trial for being in a gang. *Id.* at 835.

Here, as in *Ferguson,* the State's case depends on showing Jackson's affiliation with the Bloods. The July 21, 2006 incident was probative on that issue and was not offered to prove that Jackson acted in conformity with any past bad acts. The probative value of the evidence.in question outweighed any danger of unfair prejudice, especially when the district court provided a limiting instruction cautioning the jury as to how to use this evidence. We hold that the district court did not abuse its discretion when it admitted the July 21, 2006 incident.

### D.

▮▮▮ The State presented testimony that, on December 29, 2005, a police officer arrested Jackson for disorderly conduct after the officer stopped Jackson in a vehicle with two others who were smoking marijuana. The arresting officer testified that Jackson was arrested in Bloods territory, made gestures with his hands, and warned others that there were plain clothes cops in the area.[10]

Even assuming that evidence of this arrest was improperly admitted under Rule 404(b), the error is harmless. In light of the "cascade of evidence" on gang affiliation and the substantial evidence of Jackson's guilt, Jackson has not met his burden to show that the admission of the December 29, 2005 arrest significantly influenced the jury verdict. We therefore hold that any error in the admission of this evidence was harmless.

### III.

Jackson raises four additional issues in his supplemental pro se brief. We address each issue in turn.

### A.

▮▮▮ Before his first trial, Jackson moved to dismiss all six gang-related counts in the indictment under Minn. R.Crim. P. 17.06, subd. 2(1)(a) (insufficient evidence before the grand jury to establish the charged offense). On appeal, Jackson repeats the argument he made to the district court that "inadmissible and duplicative expert testimony ... overrode the grand jurys [sic] ability to independently exercise its judgement [sic] resulting in the return of the twelve counts in the indictment." [11] The district court denied

in it by a relevant person are proven by clear and convincing evidence; (4) the evidence is relevant to the prosecutor's case; and (5) the probative value of the evidence is not outweighed by its potential for unfair prejudice to the defendant.

10. Our review of this issue is hampered because even though this evidence was part of the State's Motion in Limine, the district court did not rule on the admissibility of this evidence in its pretrial order. When the evidence was offered at trial, Jackson did not object so there was no further opportunity for the court to rule on the admissibility of the evidence. Because Jackson opposed admission of all gang-related evidence in his response to the State's Motion in Limine, we assume that Jackson preserved his objection to this evidence.

11. Jackson also revives his argument that one of the grand jury witnesses lacked credibility. The issue of witness credibility is a question

Jackson's motion, concluding that the "liberal construction of evidentiary rules in grand-jury proceedings and the high burden Defendant must meet to justify dismissing an indictment" did not warrant dismissal in this case.

■■■ Grand juries determine probable cause, not guilt or innocence, and indictments are rarely overturned. *State v. Scruggs*, 421 N.W.2d 707, 717 (Minn.1988). The defendant bears a heavy burden in seeking to overturn the indictment, especially if the defendant has been found guilty following a fair trial. *Id.*

■■■ In the grand jury proceeding, the State presented two expert witnesses, Sergeants Zimmerman and O'Rourke, who answered questions about Minneapolis street gangs and retaliatory activities. Jackson argues that lay testimony is preferred to expert testimony, and that the testimony of Zimmerman and O'Rourke overrode the otherwise insufficient lay testimony relating this case to gang activity. *See State v. DeShay*, 669 N.W.2d 878, 888 (Minn.2003) (addressing prejudicial expert testimony in the context of trial, not before grand jury). But expert testimony is not per se barred to establish gang-related criminal activity. *See State v. Jackson*, 714 N.W.2d 681, 691 (Minn.2006). Moreover, the admission of inadmissible testimony does not require the dismissal of an indictment if the jury heard sufficient admissible evidence to establish probable cause. *State v. Greenleaf*, 591 N.W.2d 488, 498 (Minn.1999). Several witnesses before the grand jury discussed both Jackson's involvement in gang activity and the motivation for the October 5, 2006 shootings being gang related. We therefore hold that Jackson has not met his burden to prove that the indictment for gang-related offenses should be overturned.

## B.

■■■ Jackson argues that the district court abused its discretion by denying his motion to sever the offenses before the first trial. The court must sever offenses or charges if "the offenses or charges are not related." Minn. R.Crim. P. 17.03, subd. 3(1)(a). Jackson argues that the two October 5, 2006 shootings for which he is charged are not related because they involved (1) separate victims, (2) in separate circumstances, and (3) in separate places. He additionally argues that, because the identity of the shooter was a "major factual issue" at trial, he suffers unfair prejudice by the evidence of one shooting bearing on the circumstances of the other.

We review a district court's denial of a motion to sever for abuse of discretion. *See State v. Dukes*, 544 N.W.2d 13, 20 (Minn.1996), *abrogated on other grounds by State v. Dahlin*, 695 N.W.2d 588, 595–96 (Minn.2005). We examine "how the offenses were related in time and geographic proximity, and ... whether the actor was motivated by a single criminal objective." *Id.* (holding that the district court did not abuse its discretion by denying severance where the crimes happened within a few minutes, within one block, and both were motivated by robbery for money). Here, the shootings occurred within 10 minutes of each other. They occurred about a mile apart and in "Bogus Boys" or "20s" territory. The State presented evidence that both shootings were motivated by the desire to retaliate for the shooting of a Bloods member, Markey. Under these circumstances, we hold that the district court did not abuse its discretion when it denied the motion to sever.

## C.

■■■ Jackson argues that the district court erred by failing to ensure that, dur-

for the jury. *State v. Jones*, 347 N.W.2d 796, 801 (Minn.1984).

ing voir dire, the panel of potential jurors remained sequestered. One panelist reported that she and the others waiting outside the courtroom could hear voices coming from the courtroom. The reporting panel member said, "I myself didn't hear everything clearly. I could just hear voices. Nothing very clear at all." One of the other panel members was also questioned about what he heard, and he said that he heard what books a panelist ahead of him had read. The first reporting panelist, as well as four others who waited in the same location, were sworn in to serve as jurors at trial.[12]

The defense moved to "strike all the jurors who are present" on the ground that the parties operated under the assumption that the panel was sequestered and would have asked questions differently otherwise. Jackson essentially argues that the district court abused its discretion by failing to sequester prospective jurors, which resulted in exposing five sworn jurors to prejudicial material. The State responds that the decision to sequester the jury is within the court's discretion unless a juror is questioned about exposure to prejudicial material, Minn. R.Crim. P. 26.02, subd. 4(2)(a) & (b), and that no juror was exposed to prejudicial material here.

■■■ We review a district court's voir dire decisions for abuse of discretion. *State v. Chambers*, 589 N.W.2d 466, 474 (Minn.1999). The court must sequester prospective jurors only if there is a "significant possibility" that jurors will be exposed to prejudicial material that will make them "ineligible to serve." Minn. R.Crim. P. 26.02, subd. 4(2)(b); *State v. Andrews*, 388 N.W.2d 723, 732 (Minn.1986) (holding that defendant was not deprived of a fair trial by the district court's refusal

to sequester because defendant did not show a "significant probability" that prospective jurors were exposed to prejudicial material and the court did not abuse its discretion because defense counsel was not restricted in questioning). Here, Jackson has not demonstrated, nor does the record support, that any juror was exposed to information that would compromise the juror's eligibility to serve. We therefore hold that the district court did not abuse its discretion in the jury selection process.

### D.

■■■ Jackson argues that the court erred when it allowed the State to introduce what he contends was the coerced testimony of Xzavier. Jackson's claim is based on the cross-examination of Sergeant Zimmerman. Attempting to impeach Xzavier's testimony at trial, Jackson questioned Zimmerman about tactics Zimmerman used in order to obtain information from Xzavier. Zimmerman testified that he questioned Xzavier by providing statements of fact that might be true or false and letting Xzavier respond according to whether Xzavier wanted to affirm or deny the fact. Under our precedent, this tactic does not create a deceitful or stress-inducing interrogation that would make the statements inadmissible. *State v. Jones*, 566 N.W.2d 317, 326 (Minn.1997) (stating that the use of false information does not make a confession inadmissible, but instead the court looks for deceit of the kind that would make an innocent person confess). Because the State did not introduce coerced testimony, we hold that Jacksons' claim lacks merit.

Affirmed.

---

12. The court determined that panel members could hear the proceedings because the microphones were inadvertently left on. Subsequently, the court moved the prospective jurors into the hallway and turned off the microphones.

PAGE, Justice (concurring).

While I concur in the result reached by the court, I write separately to note that Minn. R.Crim. P. 9.01, subd. 3(2), is unambiguous and provides that "non-disclosure under this rule shall not extend beyond the time the witnesses or persons are sworn to testify at the trial." Given this unambiguous language, it seems to me that before his second trial, Jackson was entitled to discovery of all otherwise discoverable material and information that was withheld pursuant to the June 27, 2007, court order for witnesses who were sworn to testify at his first trial.